## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF VERMONT

U.S. DISTRICT COURT
DISTRICT OF VERMONT
FILED

2013 APR 12  PM 1: 03

BY_____
DEPUTY CLERK

| | |
|---|---|
| UNITED STATES OF AMERICA, ex rel. ) | **IN CAMERA** |
| THOMAS JOSEPH, ) | **AND UNDER SEAL** |
| ) | |
| Plaintiff, ) | **DO NOT DOCKET ON ECF** |
| ) | |
| v. ) | **COMPLAINT** |
| ) | |
| THE BRATTLEBORO RETREAT, ) | CA No.  2:13-cv-55 |
| ) | |
| Defendant. ) | **JURY TRIAL** |
| ) | **DEMANDED** |
| ) | |

### FALSE CLAIMS ACT COMPLAINT

Relator, Thomas Joseph, on his own behalf and on behalf of the United States of America, for his complaint against The Brattleboro Retreat (the Retreat), alleges as follows:

### NATURE OF THE CASE

1. This action is brought pursuant to the *qui tam* provisions of the United States False Claims Act, 31 U.S.C. § 3729-3733 (FCA). This action arises from the Retreat's fraudulent and improper claims and refund practices and policies. The Retreat certified its compliance with federal and state statutes and regulations controlling medical benefit payments by Medicare and Veterans Affairs (VA) as well as other federal health care benefit programs and by State health care programs, including but not limited to Medicare Parts A and B, Tricare, Champus, Medicaid of Vermont / Vermont Health Access Program (VHAP), Dr. Dynasaur (Vermont's State Children's Health Insurance Program, or SCHIP), the Massachusetts Behavioral Health

1

Partnership (Massachusetts' Medicaid program for mental health services), Medicaid of Connecticut, and Medicaid of Nebraska. The Retreat has received funds from the United States Treasury and the States of Vermont, Connecticut, Massachusetts, and Nebraska to which it is not entitled and which the United States and the States of Vermont, Connecticut, Massachusetts, and Nebraska would not otherwise have been required to pay.

2. Relator's claims are based on the Retreat's submission of false and fraudulent patient reimbursement claims and billing statements to the United States, including the Centers for Medicare and Medicaid Services (CMS, formerly the Health Care Financing Administration (HCFA)), and the States of Vermont, Connecticut, Massachusetts, and Nebraska to obtain payments for various mental health care services during the period from at least January 1, 2003 and continuing through the date of the filing of this Complaint.

3. During the time relevant to this Complaint, the Retreat improperly retained overpayments payable to health care benefit programs after it discovered the existence of these overpayments and took no timely remedial repayment actions as required by law. Further, the Retreat maintained deliberately falsified records concealing its obligation to make refunds of overpayments due to patients and health care benefit programs, and established a company policy or practice of refusing to make refunds absent an affirmative request for said refunds, and of obfuscating the existence of overpayments from government health benefit programs via improper use of "allowance reversals," or of making refunds only after significant and unreasonable delay.

4. In furtherance of these fraudulent policies or practices, the Retreat also transfers undiscovered overpayments from the accounts they originally were paid to into patient ledgers

that contain overpayments the government has discovered so as to offset and frustrate the government's efforts to recoup overpayments it is aware of.

5.  The Retreat generates these overpayments by knowingly or with reckless disregard for the true state of affairs submitting duplicate claims for payment to health care benefit programs on the same dates of service, and by knowingly or with reckless disregard for the true state of affairs, receiving and retaining payments from health care benefit programs for which it did not have proper documentation and to which it was not entitled.

6.  The Retreat also failed, contrary to law, to accept Medicaid, VA, Medicare Part A, and Medicare Part B (in combination with Medicaid payments or patient responsibility payments) for services as payment in full for the services for which those payments were made, or made claims to Medicaid that greatly and fraudulently exceeded the Medicare patient-responsibility amounts such claims purported to be for.

7.  On behalf of the United States, Relator seeks through this action to recover damages and civil penalties arising from the Retreat's retention of refunds of overpayments due and payable to the United States and the States of Vermont, Connecticut, Massachusetts, and Nebraska, and from false, improper, and/or duplicate charges contained in claims for payment that the Retreat caused to be submitted to the United States and the States of Vermont, Connecticut, Massachusetts, and Nebraska under various federally funded health care benefit programs.

8.  The acts alleged herein occurred in the District of Vermont, including Brattleboro, Vermont.

3

## I.  THE PARTIES

9.  Relator, Thomas Joseph, is a resident of Windham County, Vermont.  Relator, Thomas Joseph, was employed by the Retreat beginning in January of 2011, and he is still employed by the Retreat as of the filing of this Complaint.

10. The Retreat is an inpatient and outpatient mental health and substance abuse health care facility organized and doing business in the State of Vermont.  The Retreat's principal place of business is in Brattleboro, Vermont.

11. Because of the nature of its practice, the Retreat serves a wide variety of individuals in need of mental health and substance abuse health care services, many of whom are eligible for and/or enrolled in Medicare, Tricare/Champus (or other VA programs), and the various Medicaid programs of Vermont, Connecticut, Massachusetts, and Nebraska.

12. Under Medicare and Medicaid programs, the Retreat is a participating provider practice subject to statutory, regulatory, and contractual obligations regarding program compliance and certification.  The Retreat is a "provider" or "provider of services" within the meaning of 42 U.S.C. § 1395x(u), 42 C.F.R. §§ 400.202 and 405.902, and an "authorized provider" within the meaning of 32 C.F.R. § 199.6.

## II.  SOURCE OF RELATOR'S ALLEGATIONS

13. Relator states that all allegations in this Complaint are based on evidence obtained directly by Relator independently and through his own labor and efforts.  The information and evidence he has obtained or of which he has personal knowledge, and on which these allegations of violations of the False Claims Act are based, consist of documents, computer data, conversations with authorized agents and employees of the Retreat, and his own direct observation of manipulations of computer accounting data or other actions taken by such

authorized agents and employees of the Retreat. Relator is therefore an original source and has direct and independent knowledge of the instant information within the meaning of the False Claims Act, 31 U.S.C. §§ 3730(e)(4)(B). On or about September and December, 2012, prior to filing this complaint, Relator Thomas Joseph provided information concerning these allegations of fraud to the government.

### III. JURISDICTION AND VENUE

14. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 (federal question), 28 U.S.C. § 1345 (United States as Plaintiff), and 31 U.S.C. §§ 3729-3733 (False Claims Act).

15. In addition, to promote judicial efficiency, this Court may exercise supplemental jurisdiction over violations of the Connecticut Medicaid False Claims Act, Conn. Gen. Stat. §§ 17b-301 to 17b-301p, violations of the Massachusetts False Claims Act, Mass. Gen. Laws ch. 12, §§ 5A-5O, and violations of the Nebraska False Medicaid Claims Act, Neb. Rev. Stat. §§ 68-934 to 68-947, pursuant to 28 U.S.C. § 3732(b) and 28 U.S.C. § 1367(a), in that all State-created claims pleaded or that may be pleaded in this case arise out of a nucleus of operative facts common to the Federal claims.

16. This Court has personal jurisdiction over the Retreat pursuant to 31 U.S.C. § 3732(a), because the Retreat is located and does business in the District of Vermont, and the conduct herein described was engaged in by its agents and employees within this District.

17. Venue lies within the District of Vermont pursuant to 28 U.S.C. § 1391(b) and (c) and 31 U.S.C. § 3732(a) because the acts and practices alleged in this Complaint occurred within this District.

## IV. SUBSTANTIVE ALLEGATIONS

A. Definitions Applicable to This Complaint

18. The following terms shall be used as defined in the remainder of this paragraph throughout this Complaint:

a. "Allowance" means an operation that posts a credit or discount to a payer's account with the Retreat.

b. "Allowance reversal" means an operation that reverses a credit existing in a payer's account, typically used to reverse a credit posted to reflect uncollectable debt.

c. "Code 10" is the posting code used by the Retreat to indicate a payment received from an insurer, including a government health care benefit plan.

d. "Code 11" is the posting code used by the Retreat to indicate a payment by the Retreat of a credit or set-off to an insurer, including a government health benefit care plan.

e. "Code 15" is the posting code used by the Retreat to indicate a payment to the retreat from an individual patient of a charge that the individual patient, rather than any health care benefit plan, was liable for, also known as a "self-pay" payment.

f. "Code 16" is the posting code used by the Retreat to indicate that an individual patient's "self-pay" payment of a patient responsibility amount has been reversed.

g. "Code 20" is the posting code used by the Retreat to indicate the posting of an allowance to a payer's account, including a government health care benefit plan.

h. "Code 21" is the posting code used by the Retreat to indicate the posting of an allowance reversal to a payer's account, including a government health care benefit plan.

i. "Code 50" is the posting code used by the Retreat to indicate that it has paid out a refund to the listed payer.

j. "Code 51" is the posting code used by the Retreat to indicate that it has reversed an amount refunded to the listed payor.

k. "Code 55" is the posting code ostensibly used by the Retreat to indicate that it has moved amounts indicated into a posting category suggesting these funds were "Sent to State as Unclaimed Property."

l. "Code 56" is the posting code used by the Retreat to indicate a reversal of amount previously indicated on client ledger as having been "Sent to State as Unclaimed Property."

m. "Code 57" is a newly-created code used by the Retreat to indicate a status of "Pending send to state."

n. "Code 58 is a newly-created code used by the Retreat to indicate a status of "Pending send to state reversal."

o. "Code 61" is the posting code used by the Retreat to indicate the amount of a charge that is designated as the patient's responsibility.

p. "DOS" means date of service, or the date that a particular service was rendered to a patient.

q. "EOB" means "Explanation of Benefits" and refers to the written documentation a commercial insurer provides to the Retreat with each payment it remits for services rendered to beneficiaries explaining the insurer's reasoning in processing the claim for payment.

r. "Government health care benefit plan" means any health care benefit plan funded at least in part by funds appropriated from the United States Treasury.

s. "Per diem" means a charge for an inpatient hospital stay for a single day, whether or not the charge is meant to cover only room and board or room and board together with a bundle of inpatient care services. The term refers generally to room and board charges coded by the Retreat

7

as 11000, 11100, and 11400, which respectively are room and board charges for adults, adolescents or children, and "residential" adolescents or children (applied when the Retreat must also deliver educational services because school is in session at the time).

t. "RA" means "Remittance Advice," and refers to the written documentation a government health care benefit plan provides to the Retreat with each payment it remits for services rendered to beneficiaries explaining the plan's reasoning in processing the claim for payment.

B. Federal and State Health Care Benefit Programs

19. Various provisions of the United States Code authorize payment of federally funded benefits by federal and state health care benefit programs.

20. The Social Security Act codified in Title 42 of the United States Code authorizes the payment of certain benefits for medical treatment of persons who are qualified on the basis of age, disability, or affliction with end-stage renal disease. This health care benefit program is known as Medicare. Reimbursement of hospital costs or charges is governed by Part A of Medicare, 42 U.S.C. §§ 1395c through 1395i-5, and reimbursement of physicians' charges is subject to Part B, 42 U.S.C. §§ 1395j through 1395w-5. Funds to support these programs are appropriated from the United States Treasury as required pursuant to 42 U.S.C. § 1395w.

21. Administered by the Veterans Health Administration, 38 U.S.C. § 7301, federally funded payment of health care benefits for qualified veterans is authorized by 38 U.S.C. §§ 1701, et seq. Specifically, medical services in non-VA facilities are authorized by 38 U.S.C. § 1703. See also 38 C.F.R. §§ 17.52 through 17.56. These services may include medical services to veterans as well as diagnostic services, payment for which may be arranged by contracts with fiscal intermediaries. 38 U.S.C. § 1703(b). Certain eligible family members of a veteran may obtain

medical care benefits to the same extent as provided by Tricare, subject essentially to Tricare regulations. 38 U.S.C. § 1781.

22. Reimbursements for medical services provided by veterans is authorized by 38 U.S.C. § 1728 and 38 U.S.C. § 1729(c)(2). See also 38 C.F.R. § 17.56(a). Payment made in accordance with the statutes and regulations controlling VA benefits constitute payment in full and no additional charge may be imposed on the beneficiary. 38 C.F.R. § 17.56(d). The United States is entitled to recover funds reimbursed on behalf of a veteran for medical care when the veteran would be eligible for payment by a third party payer. 38 U.S.C. § 1729(a)(1); 38 C.F.R. § 17.101(a). Careful compliance in coordinating benefits for a veteran's medical care is necessary under 38 U.S.C. § 1729(e).

23. Under the Medicaid provisions of the Social Security Act, States are authorized to create state health care benefit programs and obtain federal financial participation in those programs. 42 U.S.C. §§ 1396 through 1396w-5. See also 42 C.F.R. § 430.10. Codified at  33 Vt. Stat. § 1901 et seq., Conn. Gen. Stat. §§ 17b-220 et seq., Mass. Gen. Laws ch. 118E, §§ 1 to 77, and Neb. Rev. Stat. §§ 68-901 et seq., respectively, the States of Vermont, Connecticut, Massachusetts, and Nebraska have duly enacted statutes pursuant to the Medicaid provisions as authorized by 42 U.S.C. § 1396a. Medicaid is a joint federal-state program providing health care benefits primarily to the poor and disabled. Federal participation is largely limited to the provision of matching funds and enforcement of minimum administrative standards. Appropriations are made from the United States Treasury to support the Medicaid program. 42 U.S.C. § 1396. See generally 42 C.F.R. Parts 430, 431, and 433.

24. Medical assistance available under Medicaid is defined by 42 U.S.C. § 1396d, 33 Vt. Stat. §§ 1901 et seq., Conn. Gen. Stat. §§ 17b-220 et seq., Mass. Gen. Laws ch. 118E, §§ 10 to

9

10g, and Neb. Rev. Stat. § 68-911.  See also 42 C.F.R. § 433.56.  Subject to State regulations, vendors of medical services seeking reimbursement must use claim forms and standardized coding of medical services as required by Vt. Admin. Code 12-7-1:7105.2, Conn. Agencies Regs. § 17b-262-509, 130 CMR § 450.302, and 471 Neb. Admin. Code § 3-003.01.  See generally Vt. Admin. Code 12-7-1:7100 et seq., Conn. Agencies Regs. § 17b-262-499 to 510, 130 C.M.R. ch. 450, and 471 Neb. Admin. Code ch. 3.

25. Services must be carried out in the most efficient manner so that separate procedures that are component parts of a larger procedure are ordinarily performed together and subject to a unified charge. See, e.g., 42 C.F.R. § 431.960(c)(3)(v).  All services provided by vendors must be medically necessary.  Vt. Admin. Code 12-7-1:7105.2; Conn. Agencies Regs. § 17b-262-531(g); 130 C.M.R. 450.204; 471 Neb. Admin. Code § 1-002, 1-002.02A.  Reimbursement for those services is conditioned upon compliance with Medicaid policies and procedures.  Vt. Admin. Code 12-7-1:7105.2; Conn. Agencies Regs. § 17b-262-526; 130 C.M.R. 450.212; 471 Neb. Admin. Code § 2-001.03.

26. Vendors must maintain a uniform classification of accounts and submit certified statements.  Participation in Medicaid requires providers and vendors to accept Medicaid reimbursements as payment in full, meaning that once a payment is received from Medicaid for a given service, no further claims for that service may be submitted to Medicaid, nor may any further bills for that service be imposed on the beneficiary. See, e.g., 42 C.F.R. § 447.15.

27. Participation in Medicaid also requires providers and vendors to comply with all contractual terms and Medicaid policies imposed by federal and state rules and regulations.  Vt. Admin. Code 12-7-1:7106.2; Conn. Agencies Regs. § 17b-262-526; 130 C.M.R. 450.212; 471 Neb. Admin. Code § 2-001.03.  Providers or vendors that fail to comply with Medicaid

regulations or contractual obligations may be subject to recoupment of payments by the State(s). Vt. Admin. Code 12-7-1:7106.3; Conn. Agencies Regs. § 17b-262-533; 130 C.M.R. 450.238; 471 Neb. Admin. Code § 2-002.03.

28. Medical records of providers and vendors must include documentation establishing the medical necessity of services for which reimbursement has or will be sought. Vt. Admin. Code 12-7-1:7105.2; Conn. Agencies Regs. § 17b-262-526; 130 C.M.R. 450.205; 471 Neb. Admin. Code § 3-003.02.  Physician charges may not exceed a percentage of the usual and customary charges for the service.  Vt. Admin. Code 12-6-4:8; Conn. Agencies Regs. § 17b-262-526; 130 C.M.R. 450.130; 471 Neb. Admin. Code § 2-002.03.  Certain beneficiaries of Medicaid may be required to pay nominal copayments, depending on their financial means. Vt. Admin. Code 12-3-211:4161; Conn. Agencies Regs. § 17b-262-526; 130 C.M.R. 450.238; 471 Neb. Admin. Code § 3-008.01.  These copayments are generally in the range of $3.00 to $8.00.

29. Payment of Medicaid benefits must be coordinated with Part B of Medicare and other payers.  42 C.F.R. § 431.625; 42 C.F.R. § 433.135, et seq.; 42 C.F.R. § 447.20.  Unless otherwise required by federal law, Medicaid is always the payer of last resort.  33 Vt. Stat. § 1908(b); Conn. Gen. Stat. §§ 17b-265; Mass. Gen. Laws ch. 118E, § 23; and 471 Neb. Admin. Code § 3-004.03.

30. When a vendor receives a third party payment after Medicaid has made a reimbursement for a service, the vendor must notify Medicaid and refund the payment or request a set-off against future reimbursements in a timely fashion.  Vt. Admin. Code 12-6-4:9; Conn. Agencies Regs. § 17b-262-526; 130 C.M.R. 450.235, 450.238; 471 Neb. Admin. Code § 3-004.11.  States are required to attempt to recover Medicaid overpayments.  42 C.F.R. §§ 447.30, 447.31.

31. Medicaid and Medicare are subject to essentially the same anti-fraud and anti-kickback legislation. 42 U.S.C. §§ 1320a-7b(a)(6), (d)(1), and (f)(2). These restrictions forbid payment of illegal remuneration and imposition of excessive charges. Id. A provider or a physician engaging in prohibited activities that result in submission of claims for excessive charges or for unnecessary medical services may be excluded from participation in federally funded health care benefit programs, including Medicaid. 42 U.S.C. § 1320a-7.

32. Fraudulent or improper practices justifying recoupment or other sanctions include noncompliance with contractual terms, excessive billing or overcharges, billing for undocumented services, knowingly providing incomplete or inaccurate information, persistent maintenance of poor records, and falsifying certifications. Vt. Admin. Code 12-7-1:7106.2; Conn. Agencies Regs. § 17b-262-525; 130 C.M.R. 450.307; 471 Neb. Admin. Code § 3-003.02. In all relevant States, Medicaid providers are not permitted to offer Medicaid beneficiaries any enticement or services for the purpose of inducing utilization of benefits. See, e.g., 42 U.S.C. § 1320a-7b(b)(2)(B).

33. The United States government appropriates funds to maintain additional health care benefit programs, such as Tricare, Champva, or Champus, pursuant to 10 U.S.C. §§ 1071, 1072(4), 1072(7), 1076, 1086, 1095, 1097, 1111 (Supp. 2012), and 38 U.S.C. § 1713. See also 32 C.F.R. §§ 199.1(a), (e); 38 C.F.R. § 17.270. Champus, a supplemental program, 32 C.F.R. § 199.16(a), does not apply in geographical areas in which Tricare is implemented. 32 C.F.R. § 199.4(a)(1)(ii). Champva is a secondary payer to Medicare Parts A and B. 38 C.F.R. § 17.271(b).

34. As provided by statute, 10 U.S.C. §§ 1074, 1111(a), and 1113(a), Tricare is a federally funded program providing health care benefits to the spouses and unmarried children of active

duty and retired service members, certain reservists on active duty, unmarried spouses and children of deceased service members, and retired service members.   32 C.F.R. § 199.4(a). Tricare is a comprehensive managed health care program.   32 C.F.R. § 199.17(a).

35. Pursuant to 10 U.S.C. §§ 1074(c)(2)(B) and 1079(p)(2), fiscal intermediaries are used to process claims for Tricare benefits.   Under contracts for medical services payable by Tricare, treatment must be medically necessary.   10 U.S.C. §§ 1079(a)(13), (o)(1).   The standard form for the submission of claims is prescribed by regulation under the authority of 10 U.S.C. § 1106(a). The methods for payment are provided by regulation, 10 U.S.C. § 1079(c), and authorized by 10 U.S.C. § 1097b(a), but may not exceed an amount equal to the local fee for the service; Tricare payments generally conform to reimbursements paid under Part B of Medicare.   10 U.S.C. § 1079(h)(1).

36. Deductibles and copayments are to be paid to the provider or physician as required by regulation.   10 U.S.C. §§ 1079(h)(4)(B), (j)(3); 10 U.S.C. § 1097(e).   Moreover, careful coordination of benefits is required under 10 U.S.C. §§ 1079(j)(2), 1086(d), and 1097(d).   See also 32 C.F.R. §§ 199.11(f)(3), 199.12, 199.17.   Erroneous payments resulting in overpayment of benefits may be recouped by the United States.   32 C.F.R. § 199.11.

37. "Clean" claims filed for Tricare reimbursements are paid in a timely manner.   10 U.S.C. § 1095c(a).   Deductibles may only be waived as provided by regulation.   10 U.S.C. § 1095d(a).   As with other health care benefit programs, the United States has the statutory authority to collect from third party payers to recover health care expenditures that might be expected to be reimbursed by a third party payer.   10 U.S.C. § 1095(a)(1); 32 C.F.R. § 199.17; 32 C.F.R., Part 220.   Tricare may pay such claims before seeking reimbursement from a third party payer.   10 U.S.C. § 1095b(a).

38. Acting for the United States through the Department of Health and Human Services, the Centers for Medicare and Medicaid Services (CMS, formerly the Health Care Finance Administration (HCFA)) administers the Medicare and Medicaid programs and has the authority to promulgate regulations. 42 U.S.C. § 1395hh(a)(1); 42 C.F.R. § 400.200. CMS makes periodic payments to providers and physicians who submit claims under Medicare reimbursement provisions. 42 U.S.C. § 1395l(a); 42 C.F.R., Parts 414, 415, and 424. Pursuant to statutory authority, CMS obtains the services of intermediaries to process and pay claims by providers and physicians seeking reimbursement under the Medicare statute. 42 U.S.C. § 1395u.

39. Specific types of medical services and supplies are covered under Medicare Part B. Benefits include physicians' services as well as incidental services and supplies commonly provided in the performance of physicians' services and also certain diagnostic services, 42 U.S.C. §§ 1395k(a), 1395x(q), 1395w-4(f)(4)(A) (physicians' reimbursable services), and 1395xx(a)(1). See generally 42 C.F.R. Parts 410, 411, 414, 415, and 422.

40. Under Medicare Part B, a physician has two options for receiving payment for medical services to Medicare beneficiaries. A physician may take an assignment of the coverage from a qualified patient to obtain reimbursement under Medicare. 42 U.S.C. 1395u(h)(1); 42 U.S.C. § 1395u(i); 42 C.F.R. § 414.20. Physicians may become participating physicians and accept assignments under 42 U.S.C. § 1395u(h).

41. Participating providers and physicians are required to follow billing, accounting, and documentation requirements imposed by regulations and the fiscal intermediary. 42 U.S.C. § 1320c-5(a); 42 C.F.R. § 424.5. Alternatively, a physician may decline to accept assignment and obtain a fee schedule amount plus the beneficiary's coinsurance and any difference between the physician's charge and the fee schedule amount, up to 115 percent of said fee schedule amount.

See, e.g., 42 U.S.C. § 1395w-4(g)(2)(C); 42 C.F.R. § 400.202. Physicians declining to become participating physicians may accept or decline assignment on a case-by-case basis.

42. With the exception of required deductibles and coinsurance payments, participating physicians and providers are required by statute to accept payments from Medicare for health care services as payment in full for those services; neither beneficiaries nor other benefit programs may be charged by a participating provider or physician for a health care service for which the participating provider or physician has already accepted a payment from Medicare, with the exception of the required deductibles and coinsurance payments mentioned above. 42 U.S.C. §§ 1395l(a)(1), 1395u(h); see also 42 C.F.R. §§ 412.404, 412.422.

43. The Medicare statute controlling payments under Part B establishes the schedule for reimbursement of physicians' services. 42 U.S.C. § 1395w-4; 42 C.F.R. Part 414, subpart B; 42 C.F.R. Part 405, subpart E; 42 C.F.R. Part 415, subpart C. The relative values of the components making up a physician's services are defined in 42 U.S.C. § 1395w-4(c) and 42 C.F.R. § 414.22. Further, 42 U.S.C. § 1395w-4(b)(1) determines the payments for mental health care services.

44. The Medicare statute requires the creation of regulations controlling the factors used to determine the level of payments for various physician services to Medicare beneficiaries. 42 U.S.C. § 1395u(b)(8); 42 U.S.C. § 1395w-4(c)(5); 42 C.F.R. Part 414. Providers and physicians bill services according to designated code numbers corresponding to the level of medical service provided. 42 C.F.R. §§ 405.512, 414.40, and 424.32(a)(2). A list of five-digit codes is contained in the American Medical Association's Current Procedures Terminology Manual (CPT Manual).

45. Under the statutorily mandated regulatory system establishing five-digit billing codes for use in making Medicare claims for reimbursement, various codes and modifiers are used to designate the level of service provided. 42 U.S.C. § 1395w-4(c)(4). For instance, consistent

15

with statutory definitions of the components of services, a "26 modifier" indicates that a physician delivered solely professional as distinct from technical components of a test or procedure and did not perform and integrated or "global" service. Charges having a "26 modifier" are compensated at a lesser rate.

46. Under Medicare Part B, providers of services to and physicians treating Medicare beneficiaries submit claims for reimbursement to a Medicare carrier or fiscal intermediary on forms numbered "CMS-1450" and "CMS-1500," respectively. 42 U.S.C. § 1395m(a); 42 U.S.C. § 1395w-4(g)(4)(A); 42 C.F.R. Part 424, subpart C; 42 C.F.R. §§ 424.5(a), 424.32. These forms require the provider of services or physician to provide an identification number, patient information, and the five-digit code identifying the services for which reimbursement is sought. Forms CMS-1450 and CMS-1500 list those services provided to a single patient and may include a number of codes for treatment, but each constitutes a single claim for reimbursement.

47. Likewise, physicians or providers of VA benefits must complete a claim form to obtain reimbursement for covered services. This form is designated VA Form 10-583. 38 C.F.R. § 17.124.

48. The Medicare Secondary Payer provisions require physicians and providers to submit claims by priority so that Medicare will only pay after primary payers have satisfied their obligations. 42 U.S.C. § 1395w-4(g)(3)(A); 42 U.S.C. § 1395y(b). The purpose of the Medicare Secondary Payer provisions is to prevent Medicare from becoming the primary payer so as to reduce Medicare costs. An overpayment will result when the secondary payer provisions are not properly applied.

49. The United States is statutorily prohibited from paying as the primary payer when other payers may reasonably be expected to pay a claim. Secondary payer provisions must be

coordinated among federally funded and private payers.  32 C.F.R. § 199.2(b); 32 C.F.R. § 199.8; 32 C.F.R. Part 220; 38 C.F.R. § 17.277; 42 C.F.R. Part 411, subparts B through H; 42 C.F.R. §§ 422.106, 422.108.

50. As with other federal health care benefit programs, Parts A and B of the Medicare statutes contain deductible and coinsurance provisions so that Medicare does not pay the full cost of health care provided to beneficiaries.  42 U.S.C. § 1395e; 32 C.F.R. § 199.17; 38 C.F.R. §§ 17.108, 17.110, 17.111, and 17.274; 42 C.F.R. §§ 410.160, 422.304, and 489.30.  Routinely failing to collect these deductibles and coinsurance payments shifts the cost of health care to Medicare and constitutes an impermissible discount or inducement for that class of beneficiaries from whom deductibles and coinsurance payments are not collected and promotes overutilization of Medicare.  42 U.S.C. § 1320a-7b(a); 42 C.F.R. §§ 410.152(a), 410.160, and 424.55(b)(2)(ii).

51. Under 42 U.S.C. § 1320a-7b(a)(3), providers and physicians taking Medicare assignments as well as beneficiaries themselves have a statutorily created duty to disclose overpayments and billing errors to the Medicare carrier or fiscal intermediary.  See also 42 C.F.R. §§ 401.601(d), 411.353(d); 42 C.F.R. Part 405, subpart C.  A provider or physician may not collect any amount not authorized by statute or regulation and such amounts must be refunded as appropriate. 42 C.F.R. §§ 489.40, 489.41.  Under 42 U.S.C. § 1320a-7b(a)(3), intentional concealment of or intentional failure to disclose such overpayments or billing errors is a felony.

52. When CMS pays a claim for services not provided or medically necessary, or when CMS has overpaid claims for any of a variety of reasons, including duplicate processing of charges, incorrect application of deductibles or coinsurance, uncovered services, services provided by a practitioner not qualified for reimbursement, services for which the charge is unreasonable, or

payments to physicians who have previously collected more than the deductible or coinsurance from a beneficiary, or as a result of the retention of duplicate payments, a refund is due to and a debt is created in favor of CMS. 42 U.S.C. § 1395u(l)(3); 42 C.F.R. § 411.408. In such cases, the overpayment is subject to recoupment. 42 U.S.C. § 1395gg. See generally 42 C.F.R. Part 405, subpart C. CMS is entitled to collect interest on overpayments. 42 U.S.C. 1395l(j). In addition, contractual obligations with CMS carriers or fiscal intermediaries require physicians to refund overpayments to such carriers and intermediaries. See, e.g., 42 U.S.C. § 1395u.

53. A provider of health care services or a physician is not permitted to offer discounts to other payers that are not also offered to Medicare or Medicaid. 42 U.S.C. §§ 1320a-7a(a)(5), 1320a-7b(b)(3)(A), 1320a-7(b)(6). Impermissible discounts include routine waivers of coinsurance payments. See, e.g., 42 U.S.C. § 1320a-7b(b)(3)(D).

C. The Retreat's Business and Organization

54. The Retreat is an organization that provides mental health care and substance abuse services, and is a "provider" or "provider of services" within the meaning of 42 U.S.C. § 1395x(u), 42 C.F.R. §§ 400.202 and 405.902, and an "authorized provider" within the meaning of 32 C.F.R. § 199.6. The Retreat provides inpatient and outpatient mental health care services to children, adolescents, adults, including veterans.

55. The Retreat's Patient Financial Services Department is responsible for handling billing and accounting for receipts, reimbursements, and refunds. Employees in this department include staff denominated Patient Account Representatives (PARs), whose duties primarily deal with claims processing, accounting, claims appeals, and collections.

56. Robert E. Simpson, Jr., MPH, DSW is President and Chief Executive Officer of the Retreat, and has occupied this position from approximately 2006 until the time of filing this Complaint.

57. John Blaha is Chief Financial Officer and Senior Vice President of the Retreat, and has occupied this position from approximately 2004 until the time of filing this Complaint. Mr. Blaha was hired in 2004 as Vice President and Chief Financial Officer and in 2010 was named Senior Vice President and Chief Financial Officer.

58. Lisa Dixon is the Controller and has occupied this position from approximately December 2000 until the time of filing this Complaint.

59. Jeffrey Corrigan is Vice President of Human Resources and has occupied this position from approximately October 2010 on an interim basis and in January 2011 was appointed to the position officially and has held this position until the time of filing this Complaint.

60. Jennifer Broussard, Manager of the Retreat's Patient Financial Services Department, reports directly to John Blaha, Chief Financial Officer and Senior Vice President. Ms. Broussard has worked at the Retreat for approximately 14 years and has worked as the Manager for the majority of time at issue in this Complaint.

61. Clare Bokum is the Retreat's Fiscal Case Specialist/Patient Financial Counselor and has occupied this position from approximately 1994 until the time of filing of this Complaint. Ms. Bokum during her tenure has also served as an interim or acting Manager of Patient Financial Services at certain times of her employment.

62. Rose Dietz is the Retreat's Cash Applications Specialist (aka "Cash Poster") and has occupied this position from approximately 2000 until the time of filing of this Complaint.

19

63. Deborah McFarlane is a supervisor of PARs within the Retreat's Patient Financial Services Department, and has occupied this position from early 2011 until the time of filing of this Complaint.

64. Leigh Bonnanno occupied Deborah McFarlane's position until early 2011. The position went unfilled for a period of several months, after which Deborah McFarlane assumed the duties previously performed by Leigh Bonnanno.

65. On average, the Retreat collects and receives approximately $3 to $5 million in net revenue each month from patients and third party payers, including State and federal government payers.

66. The Retreat has one (1) computer billing system, AVATAR, a product of Netsmart Technologies, headquartered in Overland Park, KS.

67. AVATAR was adopted by the Retreat as its computer billing system sometime in 2003.

68. The AVATAR computer billing system contains some thousands of claims records, including those for Medicare, Medicaid, Tricare, and other government health care benefit programs. The Retreat uses AVATAR to create billing "batches" which are then uploaded to a clearinghouse called e-Premise, a product of RelayHealth.

69. Upon information and belief, the billing for Vermont State Hospital (VSH) patients is performed manually and handled by Jennifer Broussard personally. Jamie Harvey, a Retreat employee who has dual responsibilities as a Patient Account Representative and as the Retreat's Billing Coordinator, handles the uploading of the majority of billing batches to e-Premise.

70. The Retreat receives overpayments in the ordinary course of business. For example, an overpayment results when bills are sent to more than one insurance company for the same services rendered resulting in more than one insurer paying as the primary payer. An

overpayment also occurs when Medicare is a primary payer for a patient but the patient has Medicaid as a secondary and Tricare or Champus as a tertiary payer, which causes Tricare or Champus to make an overpayment and thus to be entitled to a refund as the final payer.

71. Overpayments also occur when claims are billed to Medicaid, which duly pays the claims, and then the Retreat discovers subsequently that such patients also have Medicare or commercial insurance coverage, or when Medicare pays a claim and commercial insurance coverage for the same claim is subsequently discovered. Finally, overpayments occur when multiple claims for the same service and date of service are submitted to Medicare, Medicaid, Tricare, Champus, and/or commercial insurance.

72. The Retreat does not distribute an employee handbook to new employees. The Retreat does, however, distribute a written Compliance Plan to its employees, who are required to sign a form acknowledging receipt of the Compliance Plan, agreeing to abide by its terms, and acknowledging the requirement that any violations of the Compliance Plan are to be reported to the employee's immediate supervisor, the Retreat's Compliance Officer, or the Retreat's Compliance Hotline.

73. The Retreat's Compliance Plan requires that CMS cost reports be accurately completed, that the Retreat will seek diligently to only bill for claims for which appropriate documentation supports the claim, that the Retreat is committed to accurately tracking, reporting and refunding credit balances remaining in patients' accounts, and that any overpayments discovered will be reported and returned promptly according to the Retreat's policies.

74. The Retreat's Compliance Plan generally requires employees to act within the boundaries of the law, to receive compliance training appropriate to the requirements of their position upon hire and periodically thereafter, to accurately and honestly record and report information, and to

21

immediately report actual or suspected violations of law. The Retreat's Compliance Plan further states that any compliance issues identified will be corrected or resolved as soon as possible. The above notwithstanding, as stated herein, the Retreat ignores its own Compliance Plan in its actual practices relating to claims for payments and handling of overpayments.

75. In response to Relator Thomas Joseph's queries regarding when, if ever, self-payment and commercial insurance overpayments would be refunded to the proper parties or sent, as required by law, to the State of Vermont's Unclaimed Property division, Chief Financial Officer and Senior Vice President John Blaha informed Relator Thomas Joseph on September 5, 2012 that refunding of such overpayments had to be balanced with the Retreat's "other financial obligations, including payroll."

76. Relator Thomas Joseph further states that Jennifer Broussard, Manager of the Retreat's Patient Financial Services Department held weekly one-on-one sessions with all Department Staff including Relator Thomas Joseph prior to the hiring of Debbie McFarlane. Some months after Ms. McFarlane was hired Ms. McFarlane began to join the one-on-one sessions that Ms. Broussard held with her staff. Relator Thomas Joseph, during his one-on-one and subsequently two-on-one weekly meetings, often inquired about outstanding credit balances and was rebuffed on each occasion.

77. Relator Thomas Joseph further states that on one occasion, Ms. Broussard, in the presence of Ms. McFarlane, suggested that self-pay or patient credits "do not actually exist" until they were loaded into Ms. Broussard's Access Database, commonly referred to as AVTEST within the Patient Financial Services Department. The Retreat and Ms. Broussard's actions, as described herein, demonstrate an established Retreat policy of overpayment retention and a knowing intent to falsely keep all fund, including self-pay and government monies.

78. On information and belief and as alleged in detail below, a similar policy or practice was applied knowingly or with reckless disregard for the true state of affairs by the Retreat with respect to overpayments due and payable to government health care benefit programs.

79. When an overpayment exists to the credit of a commercial insurance payer, but no refund request respecting that overpayment is on file, Jennifer Broussard routinely uses an "allowance reversal," or posting code "21," to eliminate the credit from the patient ledger, thereby eliminating the possibility of the insurance company overpayment remaining on the client ledger or the Retreat pursuing a refund due to the fact that the individual client ledger for that patient no longer reflect the existence of the overpayment. In so doing, her hand-written notes on the patient ledgers sometimes reflect that an "allowance reversal" was done because no refund request was on file.

80. For example, on page 10 of the patient ledger for Patient 16, episode 2 of 2, case number 000066002, there is a handwritten notation which states: "Claim paid twice. No request for refund. Allowance reversal done 11/15/11," followed by Jennifer Broussard's signature. The second payment for the entire claim in the amount of $27,300.00 was posted on the patient ledger as a "ZEROCHG" entry using posting code "10," which signifies a payment from an insurer, while the resulting overpayment was eliminated from the ledger when the amount of $27,300.00 was inserted into the ledger as a "ZEROCHG" using posting code "21," indicating an allowance reversal, or reversal of a credit to the payer's account. More than eight months later, the allowance reversal entered on 11/15/2011 was itself "reversed" by the insertion, on 7/23/2012, of a third "ZEROCHG" entry in the amount of $27,300.00 using posting code "20," indicating an allowance, or credit to the payer's account.

81. This amount was inserted subsequent to Relator Thomas Joseph's e-mail communication with Jeffrey Corrigan, Vice President of Human Resources dated July 12, 2012. This communication was sent in anticipation of Mr. Corrigan's meeting that day with Robert E. Simpson, Jr., MPH, DSW, President and Chief Executive Officer, and referred to the $57,355.53 in commercial insurance credits that Jennifer Broussard, Manager of Patient Financial Services, had reversed using code 21 (an "allowance reversal" or reversal of a previously entered discount) from client accounts, the majority of which operations were performed in Relator Thomas Joseph's presence.

D. Relator's Narrative of Particulars

82. In early January of 2011, Relator Thomas Joseph accepted a position at the Retreat as a Self-Pay Collections Representative. The position described to Relator involved calling self-payers, including individuals who have an unpaid obligation to the Retreat pursuant to Medicare, Medicaid, or other government health care benefit program rules regarding beneficiary deductibles and coinsurance payments, in an attempt to resolve unpaid claims and other claims-related issues. Relator Thomas Joseph's duties as a Self-Pay Collections Representative also include attempting to collect unpaid amounts designated as "patient responsibility," as indicated on the commercial insurance remittance information or "EOB".

83. When Relator Thomas Joseph began his employment with the Retreat, Leigh Bonnano was his nominal immediate supervisor, but he reported directly to Jennifer Broussard. Subsequently, some months after Deborah McFarlane replaced Leigh Bonnano as supervisor of PARs within the Retreat's Patient Financial Services Department, Relator Thomas Joseph was required to report directly to Deborah McFarlane.

84. At the outset of his employment at the Retreat, Relator Thomas Joseph worked closely with and was trained by Clare Bokum, a Fiscal Case Specialist/Patient Financial Counselor who had responsibility for self-pay credits and assisted with some collections activity prior to the start of Relator Thomas Joseph's employment.  When Relator Thomas Joseph discovered that overpayment credits were not being refunded in a timely fashion and brought this fact to the attention of his superiors, Clare Bokum curtailed her association with Relator Thomas Joseph.

85. In November of 2011, Relator Thomas Joseph was asked by Jennifer Broussard to assist with the Retreat's handling of commercial insurance credits.  In the course of this work, Relator Thomas Joseph discovered substantial unrefunded commercial insurance credits in many patient accounts.  When Relator Thomas Joseph brought some of these unrefunded commercial insurance credits to Jennifer Broussard's attention, she entered allowance reversals using posting code 21 to eliminate the credits from any accounts for which the Retreat did not have a request for a refund from the commercial insurer on file.  This was done in Relator Thomas Joseph's presence.

86. Relator Thomas Joseph reported this action to the Retreat's Controller, Lisa Dixon, via an e-mail communication dated November 18, 2011.  Ms. Dixon's reply e-mail stated simply that "I will look into when I get a chance."  In the days following his initial communication to Ms. Dixon, she informed Relator Thomas Joseph of her intention to speak to Jennifer Broussard regarding the practice of eliminating overpayment credits for which there was no refund request on file using allowance reversals.

87. Shortly thereafter, Jennifer Broussard altered Relator Thomas Joseph's schedule to require a daily timeframe that was less accommodating of his health condition than his unaltered schedule had been.

88. A series of meetings regarding the overpayment credits due commercial insurers and self-pay patients were held, subsequent to which Jeffrey Corrigan, Vice President of Human Resources for the Retreat informed Relator Thomas Joseph that if Relator had not reported Jennifer Broussard's actions in applying allowance reversals to overpayment credits so as to avoid repayment of such overpayments, Relator would himself have been in violation of the requirements of the Retreat's Compliance Plan.

89. Despite bringing his concerns to all levels of Retreat management, including the Retreat's Executive Management Team, the Retreat has failed to restore all of the commercial insurer overpayment credits and the "allowance reversals" Relator witnessed.  As described further, herein, none of the governmental reversals has been restored.

90. Despite the apparent changes to some of the commercial reversals, Relator reports that essentially all of the restored credit balances from the original set of $57,355.53 were never actually refunded in any large amount nor has any legitimate due diligence process to restore these funds been undertaken.

91. In fact, many of the restored commercial credits from July 2012 have been the subject of subsequent transactions in their respective client ledgers indicating these amounts have been adjusted once again, this time with a posting code of "55" indicating that the commercial insurance credits are being delivered to the State of Vermont.  Relator Thomas Joseph, upon information and belief, indicates the additional transactions using posting code "55" do not in any way demonstrate or support that a legitimate or verifiable due diligence process was ever undertaken to return these funds to the commercial insurance companies or more importantly, that the funds will ever be refunded to the State of Vermont Unclaimed Property Division, as is required by law.

92. Relator Thomas Joseph further states the Retreat's use of "55" transactions increased substantially in October/November 2012 in client accounts where both commercial insurance credits and self-pay or patient credits existed. Upon information and belief, Relator Thomas Joseph believes that in the absence of a legitimate or verifiable due diligence process involving both commercial insurance and self pay or patient credits together with the lack of certainty that any funds have been or would ever be returned to the State of Vermont's Unclaimed Property Division further supports an active policy of overpayment retention.

93. In May of 2012, Relator Thomas Joseph learned that Rose Dietz, the Retreat's cash poster, had entered allowance reversals eliminating about $7,000.00 in overpayment credits due to Vermont Medicaid programs. The State of Vermont nonetheless recovered those overpayments because another PAR, Lyndsay Sunderland, had printed out the particular patient ledger involved prior to the reversal and manually filled out and sent in an overpayment remediation form requesting that the State of Vermont accept a refund of the overpayment credit due. On information and belief, absent this manual request, the overpayment would have been retained by the Retreat due to the allowance reversals.

94. Pursuant to Jennifer Broussard's request that he assist with the Retreat's handling of commercial insurer overpayments and credits in November 2011, Relator Thomas Joseph and Lyndsay Sunderland began in early 2012 a due diligence process for a limited number of the commercial and "self pay" patient credits that then existed in the Retreat's records. Prior to Relator Thomas Joseph's initial communications with the Senior Management Team in November 2011 concerning those reversals he witnessed while in the presence of Jennifer Broussard, the Retreat had no active or formal due diligence policy in place.

27

95. Relator Thomas Joseph was responsible for a select mailing of due diligence letters to self-pay or patient credits and Lyndsay Sunderland was responsible for a limited number to commercial insurance companies. Due to his suspicions regarding the Retreat's use of allowance reversals to conceal the existence of overpayment credits in favor of commercial insurers and self-pay patients, Relator Thomas Joseph began investigating whether overpayment credits in favor of Medicare, Medicaid, Tricare, Champus, and other government health care benefit programs were being treated similarly.

E. The Retreat's Fraudulent Conduct and Submissions of False Claims

96. When the Retreat has billed a charge in error, it has accepted an overpayment for that charge but then conceals the existence of the overpayment by entering an offsetting amount under posting code 21, or an allowance reversal. When an allowance reversal is applied to negate an amount paid in error by a government health care benefit program, the Retreat retains overpayments due and payable to the United States, Vermont, Connecticut, Massachusetts, and Nebraska in violation of its obligations to refund such overpayments in a reasonably timely manner.

97. Application of allowance reversals entered under posting code 21 to an overpayment renders the Retreat's quarterly credit balance reports submitted to Medicare and Medicaid on form CMS-838 inaccurate. The Retreat is required, as a condition of payment, to submit accurate form CMS-838 credit balance reports so that the government can be assured of obtaining a refund of amounts it has overpaid for medical services.

98. When the Retreat accepts and retains duplicate or otherwise erroneous payments it receives for services covered by Medicare, Medicaid, Tricare, and other government health care benefit programs, these overpayments are initially reflected on individual patient ledgers as

balances due to the various government payers. When Rose Dietz or others acting pursuant to Robert Simpson, John Blaha, Lisa Dixon and/or Jennifer Broussard's instructions enter allowance reversals into those same patient ledgers in amounts calculated to offset these overpayments, the ledgers no longer reflect that a balance is due the government payer that made the overpayment.

99. As a result of the Retreat's practice of using posting code 21 allowance reversals to offset overpayment credits due government payers, any computer reports for overpayments or credit balances would not reflect the existence of overpayments on accounts manipulated in this manner.

100. When a claim is made to Medicare or Medicaid, codes are used to indicate the services rendered to a patient and the charges on which a claim is being made. When CMS, through its carrier or fiscal intermediary, reviews the claims, it may deny some charges and pay others. In some cases, codes are incorrectly entered, causing CMS to deny payment for some services, prompting the Retreat to recode and resubmit the claims in those cases.

101. When the Retreat receives a partially paid claim from CMS, the Retreat recodes and resubmits all charges, including those for which payments have previously been received from CMS, and then resubmits the full claim, causing Medicare or Medicaid to make duplicate payments for the same services. This creates an overpayment credit in favor of Medicare or Medicaid.

102. Such overpayment credits are routinely concealed by the Retreat by applying a posting code 21 allowance reversal in an amount calculated to offset the credit balance owed to Medicare or Medicaid due to the overpayments. This operation results in the patient ledger erroneously showing a zero balance when in reality, a credit remains due and payable to a government health

care benefit program, and thus represents knowingly fraudulent avoidance or concealment of an obligation due and payable to the government.

103. This operation is knowingly fraudulent because an entry posted using code 21 is only legitimately associated with an entry of an allowance or discount credit posted using code 20 which the code 21 posting reverses, whereas in the operations described in more detail below, entries posted using code 21 are associated with entries posted using code 10, which is used for payments received by the Retreat and would be associated with a code 11 or code 50 posting if the Retreat had granted an overpayment credit or refunded an overpayment, respectively.

104. For example, for DOS 3/21/2006, Patient 1, who is a beneficiary of both Medicare and Medicaid of Vermont, received inpatient care services coded as 11000 (inpatient adult room and board) for which the Retreat nominally charges a per diem amount of $1,590.00. Medicare Part A at that time required that at the beginning of each episode of inpatient care, the beneficiary be charged a deductible of $952.00. At that time, Medicare Part A was reimbursing the Retreat for inpatient services at a per diem rate of $1,512.90, leaving $77.11 which the Retreat would be required to write off as a discount it was required to grant Medicare Part A for those services. The Medicare Part A deductible at that time was $952.00.

105. Accordingly, the Retreat submitted a claim for payment for DOS 3/21/2006 for Patient 1 at a per diem amount equal to the allowed charges of $1,512.90 less the $952.00 deductible designated by Medicare Part A as patient's responsibility, or $560.89.

106. Because Patient 1 was also an indigent Medicaid beneficiary, the Retreat submitted a claim for payment of his patient responsibility in the amount of $952.00 to Medicaid of Vermont. On April 20, 2006, the Retreat received $3,891.66 from Medicare Part A for Patient 1's inpatient per diem charges for DOS 3/21/2006. The April 20, 2006 payment resulted in an overpayment

of $3,330.77, or $3891.66 less the $560.89 that Medicare Part A legitimately was required to pay, which, when reduced by the amount of $77.11 which the Retreat would normally write off as a discount to Medicare Part A, equals $3,253.66.  The patient ledger reflects that when the Medicare Part A overpayment to the Retreat was posted on April 20, 2006 using posting code 10, a simultaneous entry using posting code 21 (signifying an allowance reversal) was posted in the amount of $3,253.66, eliminating the entire balance of the overpayment from the patient ledger.

107.  On April 27, 2006, a payment of $952.00 from Medicaid of Vermont was posted to the per diem (service code 11000) line item for DOS 3/21/2006 for Patient 1, ostensibly as payment for the Medicare Part A deductible that would have been Patient 1's responsibility if he were not also a Medicaid beneficiary, or dual-eligible.  On information and belief, these transactions were posted to DOS 3/21/2006 for Patient 1's account by Rose Dietz or another Retreat employee acting at the direction of Robert Simpson, John Blaha, Lisa Dixon, and/or Jennifer Broussard's instructions.

108.  The patient ledgers for Patient 2, episodes 12 and 14, along with the RA (remittance advice) associated with claims made to pay for the services listed in those ledgers provide a further example of the Retreat's fraudulent avoidance or concealment of overpayment credits due and payable to Medicare.  On the ledger for Patient 2's episode 14, there is a line item for the patient's treatment designated as service code 11000 for DOS 10/07/2005 for which the Retreat imposed a nominal charge of $1,590.00.

109.  At that time, Medicare Part A was willing to pay $981.34 for that service.  Accordingly, on November 10, 2005 a payment from Medicare Part A was posted to the line item for this service and DOS using code 10 in the amount of $981.34.  Also on November 10, 2005, an item

31

was posted to the line item for the same service and DOS using code 20, indicating a discount or contractual allowance credit in the amount of $608.66. These postings were proper and correct.

110. Turning to the ledger for Patient 2's episode 12, however, reveals a different set of transactions. The line items for service code 11000 on DOS 09/26/2005 and 09/27/2005 show that the Retreat imposed a nominal charge of $1,590.00 for this service and on both DOS. On October 26, 2005, there are entries posted using code 10 associated with DOS 09/26/2005 and 09/27/2005 indicating that Medicare Part A paid $3,485.84 and $3485.85, respectively, for these DOS, indicating that the Retreat was overpaid in the amount of $5009.01 for these DOS. If the Retreat intended to report or refund the overpayment to CMS, there would be a posting using code 11 or code 50, indicating a reversal of payment credit or actual refund, respectively.

111. Instead of either code, however, there is an entry that was also posted on October 26, 2005 using code 21, or reversal of a discount or contractual allowance, in the amount of $1,895.84 associated with service 11000, DOS 09/26/2005, which exactly offsets the difference between the Retreat's nominal charge for that service and DOS and the gross payment it received from Medicare Part A for that service and DOS.

112. Similarly, there is an entry that was posted on October 26, 2005 using code 21 in the amount of $1,895.85 associated with service 11000, DOS 09/27/2005, which likewise exactly offsets the difference between the Retreat's nominal charge for that service and DOS. The net result of these transactions is that the ledger for this episode erroneously and fraudulently shows a zero balance when it should reflect an overpayment due and payable to CMS in the amount of $5009.01. On information and belief, this set of fraudulent transactions was conducted by Rose Dietz or another Retreat employee acting pursuant to Robert Simpson, John Blaha, Lisa Dixon, and/or Jennifer Broussard's instructions.

113. The Retreat has also used other methods to fraudulently conceal the existence of overpayment credits due and payable to government health care benefit programs.  One such method is and has been utilized when a government health care benefit program discovers that it has overpaid a claim and executes a recoupment of such overpaid funds.

114. When this occurs, the Retreat's practice is and has been to shift undiscovered overpayments from one patient's ledger to the patient ledger(s) from which a government health care benefit program wishes to recoup the overpayments it has discovered, thereby retaining the funds that the government health care benefit program had overpaid on the first patient's claim, and furthermore concealing the continuing existence of the Retreat's obligation to repay the overpayment on the first patient's claim.

115. In addition, the same method is used to simply transfer overpayments from patient ledgers to an "Unapplied Cash" record using posting code 11, normally reserved for insurer recoupments of overpayments, effectively concealing the existence of the overpayments from anyone attempting to locate them using the patient ledgers and ensuring that such overpayments will not be reflected in the Retreat's form CMS-838 credit balance reports.

116. For example, Patient 3's ledger for episode 2 of 2, covering DOS 6/15/2010 to 7/01/2010, shows that the Retreat's nominal charge for per diem adolescent inpatient care without schooling (service code 11100) at that time was $2,135.00.  Medicaid of Vermont has determined that the amount it was willing to (and did) pay for such service on a per diem basis at that time was $768.69, reflected on the ledger by an entry under posting code 10.  The posting code 10 entry of payment is followed immediately by an entry (entered for the same service on the same DOS) in the amount of $1,366.31 under posting code 20, signifying an "allowance," or

write-off of a discount given to the insurer pursuant to statute, regulation, or contractual provision.

117. Together the code 10 and 20 entries for each per diem charge add up to the total nominal charge, thus enabling the Retreat to balance its books according to generally accepted accounting principles. However, Patient 3's ledger for episode 3 of 3, encompassing DOS 7/02/2010 to 11/09/10, reveals an interesting twist on the previously-legitimate accounting practices of the Retreat. The nominal charge the Retreat submitted for Patient 3's per diem "residential" adolescent room and board (11400) was $1,075.00. Accordingly, the Retreat was paid $284.13 by the State of Vermont Department of Mental Health (DMH) using Medicaid funds and posted using code 10 on July 22, 2010, while another $673.90 was posted using code 20 for a total amount of $958.03, or a shortfall of $116.97 from the full amount necessary to balance the ledger.

118. Unsurprisingly, then, the next entry on the ledger, associated with the same service for the same DOS, lists a payment of $116.97 from DMH posted using code 10 on September 21, 2010. Later, on December 16, 2010 but under the same service and DOS, there are three entries, two of which are for $-116.97 and one of which is for $116.97, posted using codes 11, 50,[1] and 10, respectively. The code 10 and 11 entries exactly offset each other and are likely there solely for accounting purposes, while the code 50 amount indicates that DMH, having previously agreed that it had not paid enough for the per diem when it made the July remittance and therefore paid an additional $116.97 to the Retreat for that DOS' per diem in September, had decided in December to recoup the additional amounts it had paid in September. Further down

---

1

     Posting code 50 is the one posting code that the Retreat unambiguously designates as indicating a refund that was paid to the listed third-party payer, and indicates further that an actual check was cut and sent to that third-party payer.

the ledger, there are three very large payments posted on February 5, 2011 under code 10 for the same service on the same DOS which total $80,493.35.

119.  Immediately following the first of these large (over)payments there is an entry posted on the same day under code 21 in the amount of $-673.90, reversing the allowance that the Retreat had originally posted on July 22, 2010.  Following this entry, but still associated with the same service on the same DOS, are several entries also posted on February 5, 2011 under code 11, ostensibly signifying recoupment by DMH.  This is not what actually occurred for at least some of these code 11 postings.

120.  To begin, the code 11 entries posted on February 5, 2011 to service code 11400, DOS 07/02/2010, add up to $61,940.37, or $18,552.98 less than the full amount of the overpayment for that service and DOS.  Ten days later, on February 15, 2011, posted under a different claim number but associated with the same service and DOS, there is an entry posted using code 10 in the amount of $401.10 and an entry posted using code 20 in the amount of $673.90, totaling $1,075.00, or the full nominally charged amount of the service.

121.  On February 16, 2011, posted under the original claim number but still associated with the same service and DOS, there is an entry posted using code $65^2$ in the amount of $1,075.00, signifying that the code 10 and code 20 entries posted on February 15, 2011 were transferred to the original claim for that service and DOS.

122.  Finally, on March 31, 2011, there is an entry posted using code 11 to the original claim for the service and DOS in the amount of $-6932.84. This amount, when deducted from the ostensibly remaining overpayment amount brings the total overpayment for that service and DOS

---

2

Posting code 65 is used by the Retreat to indicate a payment that was originally posted in an erroneous ledger line item, then transferred to the correct ledger line item, and is appropriately used for this purpose.

down to \$11,620.14, which when added to the second payment of \$401.10 from DMH[3] posted on February 15, 2011, rises to \$12,021.24.  When the fact that the sets of four offsetting entries in the amount of \$116.97 ended an uneven number of days after this DOS on the DOS of 8/31/2010 but the other claims activity remained the same is taken into account, the ostensible overpayment credit for service code 11400 on DOS 7/02/2010 reduces to \$11,904.27, which is the amount reflected as a credit due to DMH at the end of the ledger.

123.  The problem, however, is that at least three of the code 11 entries posted on February 5, 2011 adding up to \$18,668.05 (one in the amount of \$10,428.25, another in the amount of \$8,239.77, and a third in the amount of \$0.03) and the code 11 entry posted on March 31, 2011 in the amount of \$6932.84 were not actually refunded to DMH.  Instead, the three code 11 entries posted on February 5, 2011 reappear in an "Unapplied Cash" ledger as a single entry also posted on February 5, 2011 using code 15.[4]

124.  The result of this operation is that even if the \$11,904.27 still reflected as a credit balance on Patient 3's episode 3 ledger were to be fully refunded to DMH, the Retreat has nonetheless concealed the existence of an \$18,668.05 overpayment in DMH's favor.  In addition, that amount was posted on the "Unapplied Cash" ledger as an offset to a purported self-pay payment reversal in the same amount posted using code 16[5] some two weeks earlier on January 20, 2011.  The amount of \$18,668.05 also appears on a Cash Reconciliation Report, listing the

---

[3]

Because DMH pays Medicaid funds for these services, the payment from Medicaid in the full amount it was required to pay was required to be accepted by the Retreat as payment in full of the claim. *See* 42 C.F.R. § 447.15.

[4]

Posting code 15 is supposed to signify a payment directly from a patient, or a "self-pay" payment.

[5]

Posting code 16 signifies a reversal of a self-pay payment.

poster as Rose Dietz, the Retreat's cash poster and the patient ID associated with the payment as number 30444, the "patient ID" assigned to the "Unapplied Cash" ledger. This amount exactly matches the amount listed as recouped from a set of claims that would otherwise have been paid on the Medicaid RA issued to the Retreat on February 21, 2011.

125. The cash reconciliation report records for January 20, 2011,, contain a series of payments from DMH posted on January 20, 2011 using code 10 totaling $18,668.05, but there are no corresponding code 11 entries for those same claims to indicate that DMH had recouped overpayments from the claims the code 10 postings represent. Instead, later in the report records, there is an entry posted on January 20, 2011 using code 16 and purportedly representing a reversal of a self-pay payment from the "Unapplied Cash" ledger in the amount of $18,668.05.

126. The import of this set of transactions is that when DMH recouped the funds it knew it had overpaid, it unwittingly assisted the Retreat's fraudulent activity by helping it to further conceal the existence of overpayments in unrelated ledgers. Further, the code 11 entry in the amount of $6,932.84 posted on March 31, 2011 reappears as an offsetting amount in Patient 4 through 7's ledgers that was part of a claim for which DMH recouped overpayments it was aware of totaling $6,932.84, an amount that is not coincidentally equally matched by the amount otherwise inexplicably "reversed" using a code 11 posting from Patient 3's ledger on March 31, 2011; the fact that this amount was moved to the other patient's ledger a mere two days before the date of the RA (April 1, 2011) listing the $6,932.84 recoupment further strengthens the inference that the Retreat applied overpayments made with respect to one patient to a recoupment of overpayments made with respect to another.

127. Finally, the printed RA appearing in the Retreat's hardcopy records conclusively shows that such an illegitimate juggling of overpayments is in fact what happened: it contains a

37

handwritten annotation in Rose Dietz' handwriting showing that the recoupment of overpayments made with respect to Patients 4 through 7's claims was "paid for" by the Retreat using an overpayment amount transferred from Patient 3's ledger, stating unequivocally that the amount of $6932.84 had been "took [sic] from o/p [Patient 2]." This annotation also establishes that these operations were all performed by cash poster Rose Dietz acting at the direction of Robert Simpson, John Blaha, Lisa Dixon, and/or Jennifer Broussard's instructions.

128. The cumulative effect of these manipulations is that the Retreat's books reflect an overpayment credit due to DMH that is at least $25,600.86 less than the true amount of the overpayment due and payable to DMH, and therefore to Medicaid. With respect to these two particular accounting improprieties, it would appear that the Retreat, acting through cash poster Rose Dietz, has used Patient 3's account as a "slush fund," the purpose of which is to use undiscovered overpayments to eliminate the financial effect on the Retreat when Medicaid executes a recoupment of overpayments it is aware of.

129. The Retreat has also made claims to Medicaid of Vermont for the patient responsibility portion of dual-eligible Medicare beneficiaries that greatly and fraudulently exceeded the actual amounts designated by CMS as patient responsibility, and has therefore failed, contrary to law, to accept Medicare payments and the associated required deductibles and coinsurance payments as payment in full for the services for which payment was claimed. In making such claims, the Retreat has also presented straightforward false claims in an effort to get paid by Medicaid sums to which it was not entitled and which the United States and the State of Vermont would not otherwise be required to pay.

130. For example, on the ledger for Patient 8, episode 6, there is a line item for service 11000, DOS 07/22/2011, for which the Retreat at that time imposed a nominal charge of $2,140.00.

Associated with that line item is a pair of entries, both of which were posted on August 31, 2011. The first of these, in the amount of $806.93, was posted using code 10; the second was in the amount of $1,333.07, and was properly posted using code 20.   These entries together total $2,140.00, or the full amount of the Retreat's nominal charge for service 11000 on DOS 07/22/2011.

131.  Turning to the ledger for Patient 8, episode 8, a different pattern once again emerges.  To begin, nothing was paid by Medicare Part A for service 11000, DOS 08/29/2011 through 09/25/2011.  However, for each DOS in that range, there are three entries corresponding to service 11000.  The first of these to be posted, on June 2, 2012, represents payment in the amount of $1,285.72, was posted using code 11, and indicates that the payer was the Vermont State Hospital Fund for the Uninsured, a Medicaid-funded program of the State of Vermont (VSH).

132.  The other set of two entries for service 11000 for each DOS in the above-mentioned range were posted on June 7, 2011.  The first of these entries for each DOS was posted using code 20, is in the amount of $854.28, and indicates that the discount or contractual allowance was given to Medicare Part A.  The second entry was posted using code 61, which is supposed to indicate an amount that a third-party payer has designated as patient's responsibility; in this case, however, the code was used to transfer the payment from being designated as VSH-paid to Medicare-paid.

133.  Further, each code 61 entry was in the amount of $1,285.72, indicating that when Medicare refused to pay for those services on those DOS, the Retreat turned to the Medicaid-funded VSH to get payment for those services and DOS, and was able to get paid at a rate that was $478.79 higher than the 100% Medicare rate for the same service, rather than the amount

Medicaid would ordinarily have paid.[6]  Turning to the payments that Medicare Part A did make

for service code 11000, DOS 09/26/2011 through 11/30/2011, a third pattern emerges.  For each

DOS in this range, there are now a total of four entries associated with service 11000.

134.  As with the first set of payments in the ledger for Patient 8's episode 8, the

chronologically first-posted item in each set was posted using code 10 on June 2, 2011, and

indicates that the payer was VSH.  Each of these payments was in the amount of $524.70.  The

other three items in each set were all posted on June 7, 2011.  The first of these was posted using

code 10, and signifies a payment from Medicare Part A in the amount of $761.02.[7]  The second

was posted using code 20, and signifies a discount or contractual allowance in favor of Medicare

Part A in the amount of $854.28.

135.  The final entry in each set was posted using code 61 in the amount of $524.70, which

the Retreat was using in these cases to transfer the payments of $524.70 from VSH it posted on

June 2, 2011 and re-designate them as the patient-responsibility amounts required by Medicare

Part A rules.  Finally, for service 11000 on DOS 12/01/2011 through 12/22/2011, Patient 8 had

apparently run out of lifetime reserve days (the maximum number of hospital per diem days

Medicare Part A will pay for beyond the first 90 days it is required to pay at least part of the

charge for).  Accordingly, Medicare Part A paid nothing for that service on all of the DOS in this

final date range.

---

6

  With almost no exceptions, most states' Medicaid programs pay less than Medicare for the same services, and Vermont's program is not one of the exceptions.  *See generally* Jennifer Lubell, Medicaid Primary Care Pay: The Next SGR?, Amednews.com (May 21, 2012), http://www.ama-assn.org/amednews/2012/05/21/gvl10521.htm.

7

  The Retreat's records reflect that these payments were posted using code 10 by Rose Dietz on June 7, 2012.

136. The Retreat then looked to the Medicaid-funded VSH for payment for these DOS, and the ledger reflects that for each DOS in this final date range, the VSH paid the Retreat $1,285.72. All but two of these payments were posted on April 30, 2011, all of them were posted using code 10, and all of them are associated with a second entry posted on the same day using code 20 in the amount of $854.28, as with the earlier DOS ranges, but this time in favor of VSH instead of Medicare Part A.

137. The anomaly of a Medicaid program paying more for the same services than Medicare Part A throughout the ledger is partially resolved by looking to the RA for the Medicare Part A payments made to the Retreat for Patient 8's entire episode 8 as well as the Payment/Adjustment Report for June 7, 2012. The RA reveals that CMS imposed a downward adjustment of $148,410.17 from the Retreat's nominal charges of $219,945.96 for the 94 per diem days that made up Patient 8's episode 8, leaving $71,535.79 that CMS believed represented the full reasonable value of the service at the per diem rate.

138. The RA also shows that CMS determined that the Medicare Part A payment would be further reduced by $21,508.00 to account for the required patient responsibility portion of the remaining charges, for a net payment of $50,027.81. Turning to the Payment/Adjustment Report for June 7, 2012, the mystery of why Medicaid would pay more for a service than Medicare Part A does is fully resolved: on June 7, 2011, three postings related to this particular RA were posted to Patient 8's ledger for episode 8.

139. The first of these was posted using code 10 and was in the amount actually paid by Medicare A for the claim, or $50,027.81. The second of these was posted using code 20, and shows a discount or allowance credit in favor of Medicare Part A in the amount of $91,970.20, or

41

a full $56,439.97 less than the amount that the RA indicated should have been written off as a discount or allowance credit in favor of Medicare Part A.

140. The third posting was posted using code 61, which designates the amount that is supposed to be the patient's responsibility, and was in the amount of $70,829.81. Here again the Retreat's records diverge from the RA, as the RA indicated that only $21,508.00 was to be designated as patient responsibility. The patient responsibility amount listed in the Retreat's records exceeds the amount CMS designated on its RA as patient responsibility by $49,321.89.

141. Notwithstanding its legal obligation to submit only claims for which documentation exists, the Retreat submitted claims to VSH, a Medicaid-funded program, purportedly for this dual-eligible patient's patient responsibility amount as designated by Medicare Part A, but in the amount of $70,829.81 rather than in the amount of $21,508.00 as the patient responsibility for these DOS was determined to be by CMS. This resulted in an overpayment from VSH in the amount of $49,321.89.

142. The Retreat's record of submission of this claim to VSH, contained in the cash reconciliation report documents for June 2, 2012. Because 100% of the reasonable value of the services paid for by Medicare Part A was determined by CMS to be $71,535.79, but the Retreat actually received a total of $120,857.62, the total overpayment the Retreat received for this one patient's eight episode alone amounts to $49,321.83. The cash reconciliation report documents for June 2, 2012 show that Rose Dietz performed the transactions described in this paragraph acting pursuant to Robert Simpson, John Blaha, Lisa Dixon, and/or Jennifer Broussard's instructions.

143. In an instance involving the White Mountain Veterans Administration Medical Center (VA), the Retreat has submitted bills for "ad hoc" payment, or payment when there is not a pre-

existing contract for services, to the VA, for which the Retreat agreed to a flat rate of $1,000.00 per diem for room and board excluding physician's charges, but which the VA inadvertently paid at a rate of $1,767.20 per diem for room and board in addition to paying at a rate of 74% to 94% of the Retreat's nominal charge for additional services (i.e., physician's charges, medical supplies, nursing care, etc.).

144. In total, the room and board for Patient 9's episode 2, spanning DOS 06/15/2009 to 06/22/2009, the Retreat nominally charged $1,880.00 for room and board for seven days (the patient was discharged on the eighth day, so there was no charge for room and board), plus the following: $209.00 in physician's charges for DOS 06/15/2009; $437.67 in physician's and other charges for DOS 06/16/2009; $195.53 in physician's and other charges for DOS 06/17/2009; $197.19 in physician's and other charges for DOS 06/18/2009; $396.56 in physician's and other charges for DOS 06/19/2009; no additional charges beyond room and board for DOS 06/20/2009 and 06/21/2009; and $130.00 in physician's charges for discharge care on DOS 06/22/2009, for a total nominal charge for the additional services in the amount of $1,565.95.

145. The ledger, the attached cash reconciliation report document, and the follow-up notes report for this patient and episode show that the Retreat was paid, in addition to 94% of its nominal charges (with one exception for DOS 06/15/2009, which was paid at only 74%) for services beyond room and board, 94% of its nominal charge for room and board, or $767.20 more for each DOS than the Retreat had agreed to accept as payment in full for room and board exclusive of physician's and other miscellaneous charges.

146. In sum, then, on December 30, 2009, the Retreat received payment from the VA in the amount of $155.51 for the physician's charges for DOS 06/15/2009, $1,275.53 for the physician's and other miscellaneous charges for DOS 06/16/2009 through 06/22/2009, and

43

$12,370.40 for room and board for the entire DOS range encompassed by Patient 9's episode 2, for a total of $13,801.44. The $12,370.40 for room and board alone also represents 94% of the Retreat's nominal charge of $1,880.00 per day for seven days.

147. Even assuming that it was proper for the VA to pay between 74% and 94% of the Retreat's nominal charges for the services it rendered besides room and board, because the Retreat had agreed by contract to charge only $1,000.00 per day for room and board to this particular patient, the payment of $13,801.44 it received from the VA represents an overpayment due and payable to the VA in the amount of $5,370.40.

148. Given that the Retreat's contract rates for veterans for whom it has a preexisting contract amount to between 36% and 55% of the Retreat's nominal charge, it is doubtful that the VA meant to pay 74% of the Retreat's nominal charge for physician's services on DOS 06/15/2009, or 94% of the Retreat's nominal charge for services besides room and board on the other seven DOS encompassed by Patient 9's episode 2. Accordingly, the overpayment for Patient 9, episode 2 should be adjusted upward by at least $569.77, which is the difference between 55% of the Retreat's nominal charges for all services beyond room and board and the amount it actually received from the VA for those services, for a total overpayment stemming from the payment posted on December 30, 2009 of $5,940.17.

149. In addition, the Retreat received a second payment from the VA for the same services and DOS that was posted on January 5, 2010 totaling $1,196.00. This amount represented the full amount of the nominal charges billed by the Retreat for physician's services only (i.e., exclusive of other miscellaneous charges and of charges for room and board) for all DOS in Patient 9's episode 2. True to form, Patient 9's episode 2 ledger reflects posting of these

payments to each physician's charge in the ledger using code 10 on January 5, 2010, followed immediately by an offsetting entry posted the same day using code 21.

150. The entire amount of the January 5, 2010 payment was an overpayment, as the Retreat had already been paid more than it should have been for those services with the December 30, 2009 VA payment. The Payment/Adjustment report further documents that the posting and simultaneous concealment of the January 5, 2010 overpayment from the VA was performed by Rose Dietz. On information and belief, Rose Dietz also performed the other transactions described in this paragraph acting pursuant to Robert Simpson, John Blaha, Lisa Dixon, and/or Jennifer Broussard's instructions.

151. As a further example involving Medicare Part A and a commercial insurance carrier that should have been and apparently was eventually billed as the primary payer, Patient 10's episode 3 ledger is instructive. There, Medicare Part A apparently originally would have paid $740.00 for per diem hospital inpatient services (service code 11000) for DOS 04/18/2005 for which the Retreat claimed a nominal charge of $1590.00, resulting in an entry posted on May 11, 2005 using code 20 (discount or allowance credit in favor of the payer) in the amount of $850.00.

152. On the same day, an entry was posted in the amount of $912.00 using code 61, which normally designates an amount the Retreat has determined is the patient's responsibility, but in this case indicates a payment transferred from another payer. There is also an entry posted on the same day using code 11, indicating a reversal of an insurer payment, in the amount of $172.00, which brings the "patient responsibility" amount just mentioned down to the $740.00 that Medicare Part A would have paid were it the primary insurer. There is also an entry posted using code 10 on August 23, 2005 in the amount of $912.00 from a commercial insurance carrier,

which was then offset against the original code 61 entry for service code 11000 on DOS 04/18/2005.

153. Finally, there are two entries associated with service code 11000 on DOS 04/18/2005 that exactly offset each other, were posted on July 13, 2005 using code 10 and code 21, respectively, and are in the amount of $6,099.95. This very large overpayment was made by Medicare Part A, and the presence of the code 21 (reversal of a discount or allowance credit) means that the Retreat failed to report the existence of the overpayment and pocketed the cash instead. On information and belief, Rose Dietz performed the transactions discussed in this paragraph acting pursuant to Robert Simpson, John Blaha, Lisa Dixon, and/or Jennifer Broussard's instructions.

154. Also on July 13, 2005, a number of other overpayments were entered using posting code 10 and simultaneously concealed by entering an offsetting allowance reversal using code 21. These entries appear on ledgers for: Patient 11, episode 6; Patient 12, episode 3; Patient 13, episode 3; and Patient 14, episode 2. In all four cases, the patient's deductibles of the episode had already been exhausted (or nearly so) prior to the ledger entries in question.

155. On the one ledger that did involve an as-yet unpaid deductible, the ledger for Patient 12, episode 3, the entries posted using code 61, indicating amounts that Medicare Part A considers patient responsibility) for service code 11000 on the first two DOS add up to $912.00, or the amount of the 2005 Medicare Part A deductible for the first 60 days of an episode of hospitalization. In all four cases, the nominal charge the Retreat imposed for per diem hospital care (service code 11000) was at that time $1,590.00. In three of the four cases, each set of entries for service code 11000 on any given DOS begins with an entry posted on May 11, 2005, while in the fourth (Patient 14's) case, the same set of entries was posted on June 8, 2005.

156. In all four cases, the first entry was posted using code 20, indicating a discount or allowance credit in favor of Medicare Part A, in the amount of $850.00, while the second was posted using code 10, indicating receipt of a payment from Medicare Part A, in the amount of $740.00 (in the case of the first two DOS on the ledger for Patient 12, episode 6, these amounts were $0 and $568.00, respectively, or the difference between the full reasonable value of the service according to Medicare Part A and the amount of the patient's deductible remaining to be paid for that week, up to the full Medicare amount).

157. In all four cases, each service code 11000 for each DOS also has two more entries associated with it, both of which were posted on July 13, 2005. These entries, like the entries discussed in the preceding paragraph, exactly offset each other and were posted as a negative amount using code 21 (which normally indicates a reversal of a discount or allowance credit, but here has been used to balance away an overpayment without actually refunding or crediting the overpayment to Medicare) and a positive amount using code 10 (indicating receipt of a payment by the Retreat).

158. For Patient 11, episode 6, these offsetting entries represent overpayments concealed by the Retreat in the amount of $3,260.70. For Patient 12, episode 3, these offsetting entries represent overpayments concealed by the Retreat in the amount of $4,975.46. For Patient 13, episode 3, these offsetting entries represent overpayments concealed by the Retreat in the amount of $3,250.26. Finally, for Patient 14, episode 2, these offsetting entries represent overpayments concealed by the Retreat in the amount of $2,672.74. In total, the ledgers for these four patients' single episodes involving DOS in a limited range in April or May of 2005 contain evidence of overpayments received and concealed by the Retreat in the amount of $14,159.16 that have been (and remain) due and payable to Medicare Part A.

159. As an example of the Retreat's pattern or practice of knowingly creating or using false records or statements so as to avoid or decrease obligations to government health care benefit programs that serves to demonstrate the Retreat's intent to defraud, there is the ledger for Patient 15, episode 2. For service code 11100 (signifying adolescent or child hospital stay per diem services) on DOS 03/01/2008, the Retreat at that time imposed a nominal charge of $1,875.00.

160. On May 19, 2008, the Retreat posted using code 10 a payment in the amount of $1,875.00 it had received for that service and DOS from the Massachusetts Behavioral Health Partnership (MBHP), a Medicaid program created and administered by the State of Massachusetts. This was an unusual amount in that it was for the full nominal charge imposed by the Retreat; ordinarily, Medicaid does not pay the full nominal charge for medical services.

161. On June 20, 2008, the Retreat posted a second payment for this service and DOS from MBHP using code 10 in the amount of $600.00, which is immediately followed in the ledger by an entry posted using code 20, indicating a discount or allowance credit in favor of the payer, in the amount of $1,275.00. Then, on October 6, 2009, the Retreat received and posted to this service and DOS a payment from MBHP in the amount of $103,125.00, an amount that was obviously far in excess of the charge to which it was applied.

162. No further activity occurred in this patient and episode's account until eight months later on June 25, 2010, when MBHP took back $105,000.00 after discovering the May 19, 2008 and October 6, 2009 overpayments. Rather than report these overpayments to CMS as soon as it was aware of them, which could not have been any later than June 20, 2008, the Retreat, on October 6, 2009, also posted an entry to the same service and DOS using code 21, normally used to indicate a reversal of a discount or allowance credit previously granted to a payer, in the amount

of $105,000.00, effectively concealing the existence of the May 19, 2008 and October 6, 2009 overpayments from anyone using only ledger balances to check for overpayments.

163. Further, the Payment/Adjustment Report for October 6, 2009, shows that the code 21 entry used to conceal the existence of this massive overpayment was posted by Rose Dietz. In addition, the cash reconciliation report documents for October 6, 2009 show that Rose Dietz entered 55 individual postings referring to Patient 15's episode 2 ledger using code 11 in the amount of $103,125.00.

164. Under normal circumstances, use of code 11 would indicate that the Retreat had tendered a refund to the payer, here MBHP, but that is not what happened here. Instead, the Retreat entered these amounts on the patient ledger using code 21, which would and did have the effect of removing them from the ledger balance in such a way as to not result in a credit to the payer's account being entered; MBHP only discovered and recouped these amounts due to its own efforts, and not due to any attempt by the Retreat to comply with its obligation to report and promptly repay any overpayments it becomes aware of.

165. A further example of the Retreat's practice of knowingly concealing overpayments from government health care benefit programs involving Medicaid can be found on a series of patient ledgers. In this series of ledgers, there is evident a pattern of posting large overpayments using posting code 10 in the first DOS entries for the per diem service charge (11000, 11100, or 11400, depending on the age and residency status of the patient) that are immediately removed from the ledger balance by the simultaneous entry of an amount that exactly offsets the code 10 entry posted using code 21, which indicates reversal of a discount or allowance credit and ordinarily should only be associated with a code 20 posting.

49

166. These ledgers all contain such a pair of code 10 – code 21 entries in the first entry for the per diem service charge on the first DOS of the episode they represent. They include ledgers for: Patient 17, episode 3; Patient 18, episode 9; Patient 19, episode 16; Patient 20, episode 4; Patient 21, episode 26; Patient 22, episodes 38, 40, and 42; Patient 23, episodes 2 and 4; Patient 24, episodes 9, 10, and 12; Patient 25, episode 3; Patient 26, episode 6; Patient 27, episode 3; Patient 28, episode 2; and Patient 29, episode 7. Each of these pairs of code 10 – code 21 entries represents a purposeful concealment of funds overpaid to the Retreat by Vermont Medicaid payers.

167. With respect to Medicaid of Nebraska, the ledger for Patient 30, episode 5 shows a similar pattern to the aforementioned examples. For DOS 2/28/2011, service code 11000 (signifying per diem inpatient hospital charges for adults), the nominal charge was $2,140.00. Associated with this DOS and service code is a code 10 entry (indicating a payment received from a payer) in the amount of $401.10 posted on 08/08/2011, a code 20 entry (indicating an allowance or discount in favor of the payer) in the amount of $936.00 posted on the same day, and a code 20 entry in the amount of $802.90 posted on 08/28/2011.

168. These amounts total $2,140.00, the full amount of the nominal charge, and thus constituted receipt of payment in full from Nebraska Medicaid. That said, there are two more significant entries for DOS 02/28/2011, service code 11000 for this patient: a code 10 entry in the amount of $833.47 posted on 03/30/2012, indicative of receipt of a duplicate or erroneous payment, and thus of an overpayment, and a simultaneously posted code 21 entry (which only is appropriately used to reverse a discount, not a payment) in the same amount, or $833.47. This pattern is repeated throughout the ledger for this patient and episode.

169. In addition, from the attached contract for services and remittance advice, it is clear that Nebraska Medicaid did not contemplate paying more than $476.10 per diem for both inpatient care and educational services. It is also apparent from the accompanying reports that Rose Dietz entered both the overpayments and the accompanying "allowance reversals" concealing those overpayments. On information and belief, this was done with the knowledge and at the insistence of Robert Simpson, John Blaha, Lisa Dixon and/or Jennifer Broussard. The total amount of the overpayments concealed on this patient and episode ledger alone amounts to $38,338.72.

170. An example of the Retreat's fraudulent concealment of overpayments received from Medicaid of Connecticut can be found in the ledger for Patient 31, episode 31. For DOS 08/18/2006, service code 11400 (signifying per diem hospitalization charges for children and/or adolescents), there was a nominal charge of $1537.53. Associated with this DOS and service code are an entry in the amount of $333.72 posted using code 10 (indicating a payment from Medicaid of Connecticut) and an entry in the amount of 1,203.81 posted using code 20 (indicating an allowance or discount in favor of Medicaid of Connecticut), both posted on 02/16/2007.

171. These amounts add up to the full amount of the nominal charge, or $1,537.53, and thus constituted payment in full from Medicaid of Connecticut for this DOS and service code. However, there is an additional entry in the amount of $333.72 posted on 02/16/2007 using code 10, which here indicates a duplicate payment for the same DOS and service code from Medicaid of Connecticut. Immediately below this entry is an entry in the amount of $333.72 posted using code 21 (normally indicating a reversal of a discount previously granted to a payer) on 11/30/2007, effectively concealing the existence of an overpayment (due to duplicate payments

received) due and payable to Medicaid of Connecticut. On information and belief, this amount was posted by Rose Dietz with the knowledge and at the instance of Robert Simpson, John Blaha, Lisa Dixon, and/or Jennifer Broussard.

172.    An example of the Retreat's fraudulent concealment of overpayments received from Tricare, a federal government health care benefit program, can be found in the ledger for Patient 32, episode 6. For DOS 04/21/2005, service code 11100 (signifying per diem hospitalization charges for adolescents), there was a nominal charge in the amount of $1,695.00. Associated with this service code and DOS are an entry in the amount of $614.58 posted using code 10 on 06/27/2005 and a simultaneous entry in the amount of $1080.42 posted using code 20 on the same date.

173. These amounts add up to the full amount of the nominal charge, and thus should have constituted payment in full from Tricare to the Retreat for this DOS and service code. However, there is an additional payment from Tricare recorded in the amount of $7,374.96, posted using code 10 on 07/13/2005. Nearly two years later, there is another entry for this DOS and service code, posted on 6/02/2007 using code 21 in the amount of $7374.96, the exact amount of the overpayment from Tricare. This entry, on information and belief, was posted with the knowledge and at the instance of Robert Simpson, John Blaha, Lisa Dixon, and/or Jennifer Broussard by Rose Dietz, and was furthermore posted in a purposeful attempt to conceal the existence of the overpayment due Tricare.

174. On information and belief, each and every form CMS-838 (the quarterly credit balance reports the Retreat is required to submit to CMS through the CMS carrier or fiscal intermediary) submitted by the Retreat from 2003 to the present time has omitted, with knowledge and intent to defraud, overpayments due and payable to government health care benefit plan payers. Each

such form CMS-838 contains a section that requires the preparer to certify that the information contained in the form is true and complete to the best of the certifying person's knowledge.

175. On further information and belief, each such certification was signed by Robert Simpson, John Blaha, Lisa Dixon, or Jennifer Broussard, with knowledge of its falsity and with an intent to conceal the existence of overpayments due and payable to government health care benefit plan payers. Submission of accurate and complete form CMS-838's on a quarterly basis is a condition of payment of Medicare and Medicaid reimbursements.

176. The Retreat is also required to prepare an annual cost report for submission to its CMS-contracted carrier or fiscal intermediary that reflects the true costs of delivering services to beneficiaries of government health care benefit plans. This report, like form CMS-838, requires the preparer to certify that the information contained in it is true and complete, to the best of the preparer's knowledge.

177. Because the Retreat has a policy or practice of retaining overpayments from commercial insurers, self-pay patients, and government health care benefit plans, the allowances (code 20 entries) that remain falsely reflect that the Retreat gave larger discounts for services rendered to government health care benefit plan beneficiaries than it actually did. As a result, each and every cost report submitted to CMS from 2003 to the present time through the Retreat's carrier and/or fiscal intermediary reflected higher unreimbursed costs of care than it actually incurred. On information and belief, these reports were prepared with knowledge of or reckless disregard for their falsity and certified, falsely, as accurate and complete by Robert Simpson, John Blaha, Lisa Dixon, and/or Jennifer Broussard. Submission of accurate and complete annual cost reports to CMS is a condition of payment of Medicare and Medicaid reimbursements.

F. Damages

53

178. The United States and the States of Vermont, Massachusetts, Connecticut, and Nebraska were damaged as a result of the conduct of the Retreat in submitting or causing to be submitted false or fraudulent claims, statements, records, and claims for payment under Parts A and B of Medicare, under the State Medicaid programs of each aforementioned State, and under Tricare or other VA programs, as described in this Complaint.

179. The Retreat has profited unlawfully from the payment and retention of reimbursements to which it was not legally entitled.

180. In each of the years 2003 through 2012, the Retreat has knowingly or with reckless disregard for the true state of affairs fraudulently concealed the existence of overpayments due and payable to Medicare Parts A and B totaling up to $3,549,706.91.

181. In each of the years 2003 through 2012, the Retreat has knowingly or with reckless disregard for the true state of affairs fraudulently concealed the existence of overpayments due and payable to various State Medicaid programs (including those of Vermont, Massachusetts, Connecticut, and Nebraska) totaling up to $7,474,929.02.

182. In each of the years 2003 through 2012, the Retreat has knowingly or with reckless disregard for the true state of affairs fraudulently concealed the existence of overpayments due and payable to Champus, Tricare, and/or other VA health care benefit plans totaling up to $101,555.35.

183. In each of the years 2003 through 2012, the Retreat has knowingly or with reckless disregard for the true state of affairs fraudulently concealed the existence of overpayments due and payable to government health care benefit plans totaling up to $11,126,191.28.

## V. CLAIMS FOR RELIEF

### COUNT ONE

184. Relator realleges paragraphs 1 through 183 and incorporates them by reference as if fully set forth herein.

185. In violation of 31 U.S.C. § 3729(a)(1)(A) (2009) (formerly 31 U.S.C. § 3729(a)(1)), the Retreat knowingly or with reckless disregard or deliberate ignorance of their truth or falsity presented or caused to be presented false or fraudulent claims for payment or approval to the United States, including duplicate claims for the same services, claims that represented reimbursements that should have been offset and refunded to the United States as overpayments, false or fraudulent form CMS-838's, and false or fraudulent annual cost reports.

186. By virtue of these false or fraudulent claims on the part of the Retreat, the United States suffered millions of dollars in damages and therefore is entitled to multiple damages under the False Claims Act, as determined at trial, plus a civil penalty of between $5,500.00 and $11,000.00 for each violation.

### COUNT TWO

187. Relator realleges paragraphs 1 through 186 and incorporates them by reference as if fully set forth herein.

188. In violation of 31 U.S.C. § 3729(a)(1)(B) (2009) (formerly 31 U.S.C. § 3729(a)(2)), the Retreat knowingly or acting with reckless disregard or deliberate ignorance of their truth or falsity made, used, or caused to be made or used false records or statements, including false certifications and representations by the Retreat upon submission or resubmission of false claims for reimbursements under Parts A and B of Medicare, Medicaid, Tricare, and other government

health care benefit programs, for the purpose of obtaining payment or approval of false or fraudulent claims from the United States.

189. By virtue of using or making or causing to be made or used false records or statements, the Retreat caused the United States to suffer millions of dollars in damages. The United States is therefore entitled to treble damages under the False Claims Act, as determined at trial, plus a civil penalty of $5,500.00 to $11,000.00 for each violation.

## COUNT THREE

190. Relator realleges paragraphs 1 through 189 and incorporates them by reference as if fully set forth herein.

191. In violation of 31 U.S.C. § 3729(a)(1)(G) (2009) (formerly 31 U.S.C. § 3729(a)(7)), the Retreat knowingly or acting with reckless disregard or deliberate ignorance of their truth or falsity made, used, or caused to be made or used false records or false statements, including false certifications by the Retreat in submitting claims, with the purpose of concealing, avoiding, or decreasing an obligation to pay or transmit money or property to the United States.

192. By virtue of using, making, or causing to be made or used false records or false statements, the Retreat caused the United States to suffer millions of dollars in damages. The United States is therefore entitled to treble damages under the False Claims Act, as determined at trial, plus a civil penalty of $5,500.00 to $11,000 for each violation.

## PRAYER FOR RELIEF

WHEREFORE, Relator Thomas Joseph respectfully requests, on behalf of the United States, that judgment be entered in his favor against the Defendant Retreat as follows:

1. On the first, second, and third causes of action under the False Claims Act for the amount of the United States' damages, trebled as required by law, pre-judgment interest, such

civil penalties as are permitted by law, costs, expenses, and reasonable attorney's fees, together with such further relief as justice may require.

2. The United States requests that Defendant be ordered to cease and desist from submitting false claims and to comply fully with the statutes and regulations of the United States and the States of Vermont, Massachusetts, Connecticut, and Nebraska regarding the payment for and the accounting, billing, and overpayment reporting practices in connection with reimbursements paid pursuant to federally funded government health care benefit plans and programs.

3. Relator Thomas Joseph requests that he be awarded the maximum amount permitted pursuant to 31 U.S.C. § 3730(d).

4. Relator Thomas Joseph requests that he be awarded all costs, including court costs, expert fees, investigative expenses, and attorney's fees incurred by Relator as a result of his prosecution of this action.

5. Relator Thomas Joseph requests that he and the United States, as well as the States of Vermont, Massachusetts, Connecticut, and Nebraska be granted all other relief that the Court deems appropriate and in the interest of justice.

## JURY TRIAL DEMANDED

Relator hereby demands a jury trial on all counts.


Dated: April 12, 2013

Thomas Joseph, Relator, by and through his attorney,

Michael A. Lesser, Esq.
BBO#631128
Susan M. Ulrich, Esq.
BBO#676649
THORNTON & NAUMES, LLP
100 Summer Street, Suite 3000
Boston, MA 02110
(617) 720-1333
mlesser@tenlaw.com