**UNITED STATES DISTRICT COURT**
**FOR THE**
**DISTRICT OF VERMONT**

```
                                    :
UNITED STATES OF AMERICA,           :
Ex rel. THOMAS JOSEPH,              :
                                    :
                    Plaintiff,      :
                                    :        Case No. 2:13-cv-55
          v.                        :
                                    :
THE BRATTLEBORO RETREAT,            :
                                    :
                    Defendant.      :
```

### Opinion and Order

*Qui tam* relator Thomas Joseph ("Relator") filed this action under the False Claims Act ("FCA"), 31 U.S.C. §§ 3729-3733, against Defendant The Brattleboro Retreat ("Retreat"), alleging that the Retreat fraudulently and improperly submitted claims and retained overpayments of funds that rightly belong to the government in violation of §§ 3729(a)(1)(A)-(B) and (G) of the FCA.  After Relator filed this action, the United States conducted an investigation of the claims and declined to intervene.  Relator has opted to proceed with his claims despite the government's non-intervention.  Presently before the Court is Defendant's motion to dismiss the Complaint on the grounds that several of Relator's claims are barred by the FCA's six-year statute of limitations and that the Complaint fails to state a claim for relief as a matter of law under the heighted

1

pleading requirements of Fed. R. Civ. P. 9(b).  For the reasons stated below, the motion to dismiss, ECF No. 21, is **granted**. The Complaint is **dismissed without prejudice** and with leave to amend.

## BACKGROUND[1]

Relator Joseph brings this action pursuant to the *qui tam* provisions of the FCA, 31 U.S.C. §§ 3729-3733, against the Brattleboro Retreat, alleging that the Retreat has engaged in fraudulent and improper claims and refund practices and policies.  The Brattleboro Retreat is a mental health and substance abuse health care facility organized and operated in Brattleboro, Vermont.  The Retreat serves many individuals who are eligible for government health care benefits including Medicare and various Medicaid programs.  Relator Thomas Joseph is a Vermont resident who was formerly employed by the Retreat as a Self-Pay Collections Representative.[2]

**I. Allegations**

The Complaint brings claims under §§ 3729(a)(1)(A),(B), and

---

[1] The following facts are taken from Relator's Complaint, the allegations of which are assumed true for purposes of a 12(b)(6) motion to dismiss.

[2] Relator's position focused on collecting amounts owed by individual patients rather than those covered by government payers.  Joseph was employed by the Retreat as of the initial filing of the Complaint, but has left the Retreat since the Complaint was unsealed after the Government declined to intervene.

(G) of the FCA.[3]  Relator's primary allegation is that the
Retreat improperly retained overpayments from government health
care benefit programs even after it discovered the existence of
such overpayments, whether or not the initial overpayments were
fraudulent.  The Complaint also contends that the Retreat
generates these overpayments by knowingly or recklessly
submitting duplicate claims for payment to health care benefit
programs and that the Retreat maintained deliberately falsified
records concealing these overpayments.  Relator bases the

---

[3] This section of the Act establishes liability as follows:

(**a**) **Liability for certain acts.--**
   (**1**) **In general.**--Subject to paragraph (2), any person
   who--
      (**A**) knowingly presents, or causes to be
      presented, a false or fraudulent claim for
      payment or approval;

      (**B**) knowingly makes, uses, or causes to be made
      or used, a false record or statement material to
      a false or fraudulent claim;

      (**G**) knowingly makes, uses, or causes to be made
      or used, a false record or statement material to
      an obligation to pay or transmit money or
      property to the Government, or knowingly conceals
      or knowingly and improperly avoids or decreases
      an obligation to pay or transmit money or
      property to the Government,

is liable to the United States Government for a civil
penalty of not less than $5,000 and not more than
$10,000, as adjusted by the Federal Civil Penalties
Inflation Adjustment Act of 1990 (28 U.S.C. 2461 note;
Public Law 104-410[1]), plus 3 times the amount of
damages which the Government sustains because of the
act of that person.

31 U.S.C.A. § 3729.

allegations in the Complaint on evidence obtained directly by him through his employment at the Retreat.

The crux of Relator's theory is that the Retreat established a policy of fraudulently retaining overpayments using its computer billing system — specifically, by using posting code 21 ("Code 21") to eliminate overpayment credits in its accounting.  ¶¶ 68, 78-79.  According to the Complaint, the Retreat regularly overbills government payers, which results in a credit balance owed to these payers.  ¶¶ 100-101.  The Retreat then uses Code 21 to enter "an amount calculated to offset the credit balance owed to [the government payer] due to the overpayments."  ¶ 102.  This operation "results in the patient ledger erroneously showing a zero balance when in reality, a credit remains due and payable to the government health care benefit program, and thus represents knowingly fraudulent avoidance or concealment of an obligation due and payable to the government."  *Id.*  Relator refers to this Code 21 practice as an "allowance reversal."  ¶ 102.

Relator first discovered this practice in November of 2011 when he was asked to assist with the management of commercial insurance credits.  Through this work, he discovered unrefunded commercial insurance credits in several patient accounts.  ¶ 85. When he notified his superiors of these unrefunded credits, they entered allowance reversals using Code 21 to eliminate the

credits from any accounts for which there was no request for a
refund from the commercial insurer.  Relator reported this
action to the Retreat's Controller in an email on November 18,
2011.[4]  The Complaint states that these commercial credits were
"never refunded in any large amount nor has any legitimate due
diligence process to restore these funds been undertaken."  ¶
90.

Relator then inferred that this lack of due diligence in
the commercial insurance context indicated that the Retreat had
an active policy of overpayment retention that extended to
government programs.  ¶ 92.  He thus began "investigating"
whether overpayment credits involving Medicare, Medicaid, and
other government health care benefit programs were being treated
similarly.  ¶ 94.  The results of this "investigation" form the
basis of the allegations put forth in the Complaint.  They
regard 32 separate patient accounts spanning from 2005 to 2012.
The descriptions of these accounts do not reference any actual
bills or reimbursements, but are instead based on Relator's
interpretations of accounting entries and codes in the Retreat's
billing system.  The allegations in the Complaint implicate
three types of misconduct: (1) fraudulent retention of

---

[4] Relator contends that his schedule was altered after he made this
report in a manner "less accommodating of his health condition than his
unaltered schedule had been."  ¶ 87.  The Complaint makes no other
references to this issue.

overpayment from government programs; (2) fraudulent double billing for services (resulting in the eventual fraudulent retention); and (3) falsified quarterly/annual reports.  The details of these allegations as laid out in the Complaint are summarized below.

      *a. Fraudulent Retention*

Relator's primary contention is that the Retreat frequently accepts overpayment for services and conceals these overpayments by entering an offsetting amount under Code 21 (what the Complaint calls an "allowance reversal").  The Complaint describes several specific examples, discussed below, as supposed evidence of this practice.

In March 2006, Patient 1, a beneficiary of both Medicare and Medicaid of Vermont, received inpatient care services for which the Retreat charges a per diem amount of $1,590.  At the time, Medicare Part A required patients to pay a deductible of $952.00 and was willing to pay a $1,512.90 per diem rate for this service ($77.11 less than Retreat's nominal charge).  The Retreat thus submitted a claim to Medicare Part A for the per diem minus the deductible, or $560.89.  It then submitted a claim for payment to Medicaid for the $952 deductible, which Medicaid paid.  On April 20, 2006, the Retreat received $3,891.66 from Medicare Part A for Patient 1's inpatient care. The Complaint alleges that this payment resulted in an

6

overpayment of $3,330.77 that was eliminated using Code 21. However, because the Complaint does not indicate what Patient 1's proper bill would be, beyond the per diem rate, there is no demonstration in the Complaint that this actually was an overpayment.

The remaining examples provided are similarly deficient. The Complaint cites patient ledgers for Patient 2, episodes 12 and 14, from October 2005, as an example of the Retreat's fraudulent retention of overpayment from Medicare.  ¶ 110.  For this patient, the line items in the billing system indicate that the Retreat imposed a nominal charge of $1,590 for the service received but that Medicare Part A paid $3,485.84, and that there was a Code 21 entry for the difference.  The Complaint additionally cites Patient 10, who was treated at the Retreat in 2005, and states that the Retreat received an overpayment from Medicare equaling $6,099.95 that the Retreat failed to disclose using Code 21.  ¶ 154.  The Complaint also describes a transaction involving Patient 30 that resulted in a $833.47 overpayment by Nebraska Medicaid.  The Complaint does not state its basis for finding an overpayment occurred, nor whether the alleged overpayment was ultimately retained, for any of these patients.

Based on these transactions, the Complaint extrapolates that *all* entries involving Code 21 involve improper retention.

It then goes on to cite multiple entries using Code 21, with even less identifying information than those described above, as additional proof of wrongdoing.  Several of these patient ledgers, Patients 11-14, are dated July 2005.  The Complaint also cites several patient ledgers without any identifying information at all.  ¶ 166.  Finally, it states that there were Code 21 entries for Patients 31 and 32 and concludes that these were hidden overpayments; however, it again does not demonstrate why these involved overpayments, what the proper payment rate would have been, or whether any excess charges were actually retained.  In fact, the Complaint identifies a Code 21 "allowance reversal" that eliminated $7,000 owed to a Medicaid program and was later rectified by a manual request, which he expressly concedes resulted in no overpayment at all.

In addition to documenting the allegedly fraudulent practice of "allowance reversals," the Complaint also asserts that the Retreat conceals the existence of overpayment credits by shifting undiscovered overpayments from one patient's ledger to the ledger of another patient or to an "Unapplied Cash" ledger.  As evidence, the Complaint cites Patient 3's billing information to allege that the Retreat was overpaid by the government and rather than returning the overpayment, the excess was diverted to the Retreat's Unapplied Cash ledger on February 5, 2011.  This allegation suffers from the same deficiencies as

the descriptions of Patients 1 and 2.  While the Complaint states that amounts as high as $80,493.35 were overpaid, it does not explain how it obtained these estimates or what the proper charge would have been.  It then states that reimbursement entries posted in February 2011 amounting to $18,668.05 were never refunded to the government, but it does not provide a basis for this assertion.  The Complaint further states that evidence of this patient ledger juggling is provided by a handwritten annotation indicating that overpayments made regarding Patients 4 through 7 were paid for using Patient 3's overpayment.  ¶ 127.[5]  It concludes that the retreat had "used Patient 3's account as a slush fund."  ¶ 128.

Relator's final allegation of improper retention does not actually allege retention at all, but mere delay.  In support, the Complaint describes Patient 15, for whom the Retreat overcharged a Medicaid program in Massachusetts.  ¶ 159-62.  While the Complaint concedes that the Medicaid program was reimbursed for the overcharge, it states that the Retreat should have notified Medicaid program of this overcharge sooner.  The Patient 15 allegation is somewhat nonsensical, however, as it seems to argue that the Retreat should have known about the overpayment over a year before it was received.  ¶ 161.

---

[5] The Complaint actually cites language from the note saying amount had been taken "from Patient 2"; presumably this is a typo and the Complaint intended to say Patient 3 here.

Regardless, there is no dispute that any overpayment was ultimately refunded with regard to Patient 15.

### b. Double Billing

Relator also alleges that the Retreat has fraudulently double billed government programs, thereby resulting in overpayments like those referenced above. Specifically, the Complaint alleges that the Retreat made fraudulent claims to Medicaid of Vermont for the patient responsibility portion of dual-eligible Medicare beneficiaries, i.e., patients eligible for both Medicare and Medicaid benefits. It states that the Retreat "presented straightforward false claims" to obtain Medicaid sums to which it was not entitled. ¶ 129. As a supposed example of this practice, the Complaint cites the patient ledger for Patient 8, Episode 8, and describes a number of confusing billing entries. First, it notes that there were entries for June 7, 2011, several months before Episode 8 began. It then states that the Retreat sought payment from a Medicaid program at a rate of $1,285.72, which is higher than the amount that Medicare is willing to pay for such services, and thus infers that this constituted an improper claim. ¶ 133. Finally, it argues that the Retreat sought $70,829.81 of patient responsibility from Medicaid in excess of the amount determined by the Center for Medicare & Medicaid Services ("CMS"), resulting in an overpayment of $49,321.89. The Complaint does

not indicate what the appropriate charge for the episode actually was, nor does it indicate whether any alleged overpayment was repaid or not.

Relator also cites Patient 9, from 2009, as evidence of additional false claims submitted by the Retreat.  The Complaint contends that Patient 9's ledger shows that the Retreat was paid more for the service than it had agreed to accept as payment; however, it does not demonstrate what the agreed-upon rate was or the source of this information.  ¶ 145.  Furthermore, the Complaint's description of this episode is inconsistent.  It states that the Retreat had "agreed by contract" with the government payer to charge a lower rate for room and board to Patient 9, but two paragraphs earlier states that the episode in question involves a payment where there was "*not* a pre-existing contract for services" between the Retreat and the payer.  ¶ 143 (emphasis added).  It then concludes that the patient must have been overcharged, resulting in false claims.

Finally, Relator contends that such overpayments are regularly received because when the Retreat receives a partially paid claim from a government program, it recodes and resubmits all charges as a full claim, resulting in duplicate payments for the same services.  ¶ 101.

   c. *Quarterly/Annual Balance Reports*

The Complaint also posits that the use of Code 21 renders

11

the quarterly and annual balance reports submitted to Medicare
and Medicaid inaccurate.  It states that all of the quarterly
credit balance reports the Retreat is required to submit to the
government programs have "omitted, with knowledge and intent to
defraud, overpayments due and payable to government health care
benefit plan payers."  ¶ 174.  The Complaint further states that
"on further information and belief," each of these forms was
signed by representatives of the Retreat "with knowledge of the
falsity and with an intent to conceal the existence of
overpayments due and payable to government health care benefit
plan payers."  ¶ 175.  However, it does not cite any specific
balance reports or any specific inaccuracies contained therein
to support this assertion.

**II.    Procedural History**

Relator filed this FCA action on April 12, 2013, alleging
that for the years 2003 through 2012, the Retreat has knowingly
or recklessly concealed the existence of overpayments due and
payable to Medicare and State Medicaid programs totaling up to
$11 million.  The FCA Complaint contains three counts: (1) for
presenting false or fraudulent claims under 31 U.S.C. §
3729(a)(1)(A); (2) for making false records or statements for
the purpose of obtaining payment of false claims under 31 U.S.C.
§ 3729(a)(1)(B); (3) for making false records or statements with
the purpose of concealing, avoiding, or decreasing an obligation

12

to pay or transmit money or property under 31 U.S.C. § 3729(a)(1)(G).

As required by the FCA, the Complaint was initially filed under seal and *ex parte*, and the U.S. Departments of Justice ("DOJ") and Health and Human Services ("HHS") were provided an opportunity to investigate Relator's allegations.  On August 20, 2013, the United States declined to intervene, ECF No. 6, and this Court subsequently ordered that the Complaint be unsealed, ECF No. 7.  Relator took no action to serve the Retreat with the Complaint until 120 days after the Court's order to unseal.  On January 8, 2014, Relator filed a notice of intent to appear *pro se*, which was opposed by the United States.  Relator obtained new counsel and on January 23, 2014, after receiving an extension of time in which to file, filed the Complaint.  On March 11, 2014, the Retreat filed the instant motion to dismiss.

## DISCUSSION

### I.   Standard of Review

Presently before the Court is Defendant's motion to dismiss the Complaint for failure to state a claim pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure.  To survive a Rule 12(b)(6) motion to dismiss, the Complaint must articulate a plausible claim for relief.  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  This plausibility standard is satisfied "when the plaintiff pleads factual content that allows the court to draw

13

the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007)).

Because the FCA is "an anti-fraud statute," FCA claims are subject to a heightened pleading standard pursuant to Rule 9(b).[6] *Gold v. Morrison-Knudsen Co.*, 68 F.3d 1475, 1476-77 (2d Cir. 1995) (explaining that "claims brought under the FCA fall within the express scope of Rule 9(b)"); *Wood ex rel. U.S. v. Applied Research Associates, Inc.*, 328 Fed. Appx. 744, 747 (2d Cir. 2009) (finding that FCA complaint must meet heightened pleading standards of Rule 9(b)).  Rule 9(b) requires that "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake."  Fed. R. Civ. P. 9(b).  Rule 9(b) thus requires that a complaint (1) specify the actions that the plaintiff contends to be fraudulent; (2)

---

[6] In his opposition to the motion to dismiss, Relator argues that 9(b)'s particularity requirements should be relaxed because the alleged fraud is complex.  *See U.S. ex rel. Smith v. Yale University*, 415 F. Supp. 2d 58, 84 (D. Conn. 2006) (relaxing 9(b) particularity requirements where "alleged fraud is extremely complex, involves thousands of instances, occurred over an extended period and involves information 'peculiarly within the adverse parties' knowledge'").  He argues that because the fraud alleged here involved numerous transactions, the Court should relax the 9(b) pleading requirements. However, this is not an appropriate case for such lenience.  This relaxed standard is generally applied where the Plaintiff/Relator is not in a position to know specific facts.  Here, the Relator worked in the department responsible for billing and claimed to be an insider. *See Ping Chen ex rel. U.S. v. EMSL Analytical, Inc.*, 966 F. Supp. 2d 282, 302 n.14 (S.D.N.Y. 2013) (refusing to apply relaxed standard where plaintiff could not identify a "single specific false claim" despite having worked for defendant for four years).  Thus, the heightened 9(b) standards properly apply.

14

identify the fraudulent actor; (3) state where and when the
fraudulent activity occurred; and (4) explain why the actions
were fraudulent. *See Wood*, 328 Fed. Appx. At 747 (citing
*Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1128 (2d Cir.
1994)). To be fraudulent, a false statement must have been made
with the requisite scienter, and thus the Complaint must "plead
the factual basis which gives rise to a strong inference of
fraudulent intent." *Id.* (quoting *O'Brien v. Nat'l Prop.
Analysts Partners*, 936 F.2d 674, 676 (2d Cir. 1991).

## II.  Statute of Limitations

Defendant's motion to dismiss begins with the assertion
that several of the events identified in the Complaint are time-
barred by the FCA's statute of limitations and cannot form the
basis of Relator's suit.  The FCA's statute of limitations
expressly provides that:

> **(b)** A civil action under section 3730 may not be brought--
>
> > **(1)** more than 6 years after the date on which the
> > violation of section 3729 is committed, or
> >
> > **(2)** more than 3 years after the date when facts
> > material to the right of action are known or
> > reasonably should have been known by the official of
> > the United States charged with responsibility to act
> > in the circumstances, but in no event more than
> > 10 years after the date on which the violation is
> > committed,
>
> whichever occurs last.

31 U.S.C. § 3731(b).  Thus, the FCA applies a six-year statute
of limitations precluding relator claims filed "more than 6

years after the date on which the violation of [the FCA] is committed." *United States v. Baylor Univ. Med. Ctr.*, 469 F.3d 263, 267 (2d Cir. 2006) (quoting 31 U.S.C. § 3731(b)(1)).  The FCA's six-year statute of limitations begins to run "'on the date the claim is made, or, if the claim is paid, on the date of payment.'"  *U.S. ex rel. Kreindler & Kreindler v. United Techs. Corp.*, 985 F.2d 1148, 1157 (2d Cir. 1993) (quoting *Blusal Meats, Inc. v. United States*, 638 F. Supp. 824, 829 (S.D.N.Y. 1986), *aff'd*, 817 F.2d 1007 (2d Cir. 1987)).  This six-year statute of limitations applies to all civil actions brought under § 3730, and thus applies to all three of Relator's theories of relief: actual submission of a false claim under §§ 3729(a)(1)(A) and (B) and "reverse" false claims under § 3729(a)(1)(G).

Relator filed the Complaint on April 12, 2013; thus, any allegations based on false claims that occurred prior to April 12, 2007, are time barred.  The Complaint identifies alleged overpayments with respect to 32 patient accounts.  Nine of these alleged misdeeds (regarding Patients Nos. 1, 2, 10, 11-14, and 31-32) occurred more than six years prior to the date Relator filed the Complaint.  Because they fall outside the statute of limitations, they cannot form the basis of Relator's Complaint and they are dismissed.[7]

---

[7]  The Complaint also contains allegations regarding an additional thirteen patients (Patients Nos. 17-29) that provide no dates

16

In his Opposition to Defendant's Motion to Dismiss, Relator quotes a decision from the Southern District of New York for the proposition that a *qui tam* plaintiff must bring suit within three years after he or the government learned of the material facts, in essence conflating parts (1) and (2) of § 3731(b). *See* Opp'n Mot. Dismiss at 9 (quoting *U.S. ex rel. Thistlethwaite v. Dowty Woodville Polymer, Ltd.*, 6 F. Supp. 2d 263, 265 (S.D.N.Y. 1998)). However, the Opposition quotes *Thistlethwaite* out of context and is wholly a misstatement of the district court's holding in that case. Relator's quote comes from a "but see" parenthetical of a district court decision in the Middle District of Alabama. The *Thistlethwaite* court distinguishes this position to find that "[b]y the clear statutory language, the Relator's time is not extended to three years after the United States official learns of the violation. That provision only applies to the government." *Thistlethwaite*, 6 F. Supp. 2d at 265. *Thistlethwaite* therefore actually stands for the position that the statute of limitations applicable to Relator's claims goes back six years from his April 2013 suit, to April 2007. All alleged conduct predating April 2007 is time barred from consideration in this action.

---

whatsoever.  Defendants argue in their motion to dismiss that these events also fall outside the statute of limitations; however, it is unnecessary to determine this issue as they plainly fail under the Rule 9(b) specificity standard as discussed *infra*.

**III. Complaint Fails to Plead Fraud with Particularity**

Defendant's motion to dismiss argues that the Complaint fails to state a claim with the particularity required by Rule 9(b).  As explained above, because the FCA is an anti-fraud statute, the heightened pleading requirements of Rule 9(b) apply.  To satisfy this heightened pleading standard, the Complaint must (1) specify the actions that the plaintiff contends to be fraudulent; (2) identify the fraudulent actor; (3) state where and when the fraudulent activity occurred; and (4) explain why the actions were fraudulent.  *See Wood*, 328 Fed. Appx. At 747.  "'In other words, 'Rule 9(b) requires that a plaintiff set forth the "who, what, when, where and how of the alleged fraud.'"  *U.S. ex rel. Polansky v. Pfizer, Inc.*, No. 04-cv-0704 (ERK), 2009 WL 1456582, at *4 (E.D.N.Y. May 22, 2009) (quoting ).

The Second Circuit has explained that "the purpose of Rule 9(b) is threefold — it is designed to provide a defendant with fair notice of a plaintiff's claim, to safeguard a defendant's reputation from 'improvident charges of wrongdoing,' and to protect a defendant against the institution of a strike suit."  *O'Brien*, 936 F.2d at 676 (quoting *Ross v. Bolton*, 904 F.2d 819, 823 (2d Cir. 1990)).  These purposes apply with full force to claims under the FCA, as the Act provides a windfall to the first person to file, and permits Relator recovery on behalf of

18

the real victim, the Government.  The heightened requirements of 9(b) are thus particularly salient in cases brought under the FCA by a Relator.  Here, Defendants argue that the Complaint fails to meet the Rule 9(b) specificity requirements with regard to any of its claims.

### a. Counts I and II fail because the Complaint does not Specify False Claims

The Complaint brings claims under multiple sections of the FCA.  Counts I and II assert claims for alleged violations of § 3729(a)(1)(A), which applies where one "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval," and (a)(1)(B), which creates liability for making a "false record or statement material to a false or fraudulent claim."  To mount a plausible claim for relief under these sections, a complaint must plead a (1) claim submitted for payment by the defendant within the meaning of the FCA; (2) that the claim itself or a statement material to the claim must have been false or fraudulent; and (3) that the defendant knew that the claim or statement was false or fraudulent.  *See U.S. ex rel. Pervez v. Beth Israel Med. Ctr.*, 736 F. Supp. 2d 804, 811 (S.D.N.Y. 2010).  Courts in the Second Circuit have held that "allegations of violations of federal regulations are insufficient to establish a claim under the FCA if plaintiff cannot identify, with any particularity, the actual false claims

19

submitted by the defendant." *United States v. Dialysis Clinic, Inc.*, 5:09-CV-00710, 2011 WL 167246, at *10 (N.D.N.Y. Jan. 19, 2011); *see also Ping Chen*, 966 F. Supp. 2d at 301 (same); *U.S. v. Empire Educ. Corp.*, 959 F. Supp. 2d 248, 254 (N.D.N.Y. 2013) ("[Plaintiff] must not only allege with particularity 'the underlying schemes and other wrongful activities' but also the resulting 'submission of fraudulent claims.'" (quoting *U.S. ex rel. Mooney v. Americare, Inc.*, No. 06-cv-1806, 2013 WL 1346022, at *3 (E.D.N.Y. Apr. 3, 2013)).

Defendant thus argues that both Count I and II should be dismissed because nowhere in the Complaint does Joseph allege that there was a "claim" submitted for payment with the specificity required by Rule 9(b) and thus the allegations concerning claim submissions are all too generalized to meet the heightened pleading standard.  In fact, the Complaint does not identify any specific claims submitted within the statute of limitations, instead making references to billing entries without identifying if and when these entries corresponded to actual claims.

The Complaint only refers to alleged false claims at three instances.  First, it states that "[w]hen the Retreat receives a partially paid claim from CMS, the Retreat recodes and resubmits all charges, including those for which payments have previously been received from CMS, and then resubmits the full claim,

causing Medicare or Medicaid to make duplicate payments for the same services." Compl. ¶101. Relator provides *no* specific support for this assertion; indeed, the following paragraphs (which describe an incident from 2006, outside the statute of limitations) describe an incident wherein Medicare had a deductible designated as the patient's responsibility, and Defendant submitted a claim for payment of this deductible from Medicaid (because the patient was also an indigent Medicaid beneficiary). Even if this incident was not outside the statute of limitations, it would not support Relator's theory because the Complaint does not explain why this was a false claim. The Complaint then goes on to state that Medicare overpaid Defendant because Defendant billed more than its per diem; however, the Complaint does not explain how it reached that conclusion. At no point does the Complaint identify a false duplicate claim, and thus the allegations in Paragraph 101 are too unspecific to meet the Rule 9(b) pleading requirement.

Second, the Complaint alleges that the "Retreat has also made claims to Medicaid of Vermont for the patient responsibility portion of dual-eligible Medicare beneficiaries that greatly and fraudulently exceeded the actual amounts designated by CMS as patient responsibility" and that it has "also presented straightforward false claims in an effort to get paid by Medicaid sums to which it was not entitled and which the

United States and the State of Vermont would not otherwise be required to pay." Compl. ¶ 129. This paragraph fails to identify any specific instances of either act, and the ensuing paragraphs provide no additional information. Instead, the following paragraphs describe Patient 8, Episode 8. The narrative provided is very confusing, but it is clear that it does not identify any specific claims for payment, instead speculating about overpayment based on different billing codes in the Retreat's accounting system. These allegations are mere speculation and thus do not meet the standard for 9(b) specificity. *See Johnson*, 686 F. Supp. 2d at 266 ("[T]he plaintiffs' fraud claims do not state a claim, but merely *speculate* that a claim might exist.").

Furthermore, in discussing this episode, the Complaint asserts that the Retreat submitted claims to Medicaid for a dual-eligible patient's patient responsibility amount in an amount greater than that designated by the government. However, the Complaint does not allege when these claims were submitted or by whom, nor does it specify what the appropriate reimbursement rate was. It thus does not provide "'the time, place, speaker, and ... even the content of the alleged misrepresentations'" and "'lacks the "particulars" required by Rule 9(b).'" *Wood*, 328 F. App'x at 748 (quoting *Luce v. Edelstein,* 802 F.2d 49, 54 (2d Cir. 1986)). The Complaint

22

therefore does not plead sufficiently particular facts to support its allegations in Paragraph 129.

Finally, the Complaint asserts that the Retreat's submission of quarterly and annual reports constituted a false or fraudulent claim, on the theory that the other allegations in the Complaint necessarily demonstrate that the Retreat kept false records.  However, the Complaint does not point to any specific reports, much less identify any particular statements in such reports that are false.  Broad references to such reports are insufficient under Rule 9(b).  *See Wood*, 328 F. App'x at 749-50 (citing allegation that "various cost reports . . . all contained false claims for reimbursement and made false statements" as example of "allegations [that] are plainly insufficient under Rule 9(b)").

Because the Complaint does not "cite to a single identifiable record or billing submission they claim to be false, or give a single example of when a purportedly false claim was presented for payment by a particular defendant at a specific time," *id.* at 750, the allegations in the Complaint are too speculative and conclusory to support an inference of a fraudulent claim, and the Counts under § 3729(a)(1)(A) and § 3729(a)(1)(B) are dismissed for failure to state a claim as a matter of law.

**b. Complaint fails to state a claim for reverse False**

Claims Act liability

In addition to the counts asserting false claims, Relator also brings a count under § 3729(a)(1)(G), the "reverse false claims" provision of the FCA, which creates FCA liability for (1) making a false record or statement material to an obligation to pay or transmit money or property to the Government or (2) knowingly concealing, avoiding, or decreasing an "obligation to pay or transmit money or property to the Government."  31 U.S.C.A. § 3729(a)(1)(G).[8]  As above, Defendant contends that the Complaint fails to allege particularized facts sufficient to state a claim under this section of the FCA, and that Count III must also be dismissed for failure to state a claim.

### i. False Statements

Defendant first argues that any claim under the first prong

---

[8] Defendants note in their motion to dismiss that this section of the FCA did not exist prior to a May 20, 2009 amendment of the statute. Before the amendment, the statute only created liability for the knowing use of a "false record or statement to conceal, avoid, or decrease an obligation . . . to transmit money or property to the Government."  Defendant thus argues that § 3729(a)(1)(G) only applies to conduct that occurred after this date.  *See* FERA, Pub. L. No. 111-21, 123 Stat. 1625 (amendment applies to conduct alleged to have occurred after enactment).  Because the previous version of the statute created liability for false statements to conceal an obligation to pay, the non-retroactivity of the amendment does not impact the first prong of § 3729(a)(1)(G).  However, it arguably affects the second prong. *See U.S. ex rel. Yannacopoulos v. Gen. Dynamics*, 636 F. Supp. 2d 739, 752 (N.D. Ill. 2009), *aff'd*, 652 F.3d 818 (7th Cir. 2011) (finding that prior to FERA's enactment, "retention of [an] overpayment did not create an obligation under the former provisions of the FCA").  The Court need not determine this, however, because it finds that Relator fails to plead facts with the requisite particularity regardless of whether pre-2009 conduct is considered.

of § 3729(a)(1)(G) fails because the Complaint does not adequately identify a knowing and material false record or statement.  The Complaint does not identify any bills or reimbursements, but instead draws inferences from accounting entries and codes in the Retreat's billing system — specifically, Code 21.  Much of the Complaint relies on the theory that *all* entries involving Code 21 represent improper retention of overpayments.  However, the Complaint does not explain how these codes constitute false records or how they indicate obligations owed to the government.  In fact, the Complaint expressly mentions occasions when the use of Code 21 resulted in no avoidance of a government obligation — instead, the overpayment in question was repaid in full.  *See, e.g.*, Compl. ¶¶ 93, 162.  This negates the Complaint's theory that every Code 21 entry necessarily indicates the presence of improper retention.  Thus, the Complaint fails to explain how the accounting codes — whether used inaccurately or not — actually correspond to nonpayment of obligations.  *See Yannacopoulos*, 636 F. Supp. 2d at 748-49 (noting that how defendant "internally accounted for funds it had received is immaterial to Relator's FCA claim" as internal accounting had no correlation with whether refund occurred).

Relator again raises the quarterly and annual reports as false statements regarding the Retreat's obligations.  These

25

statements fail to meet the 9(b) requirements for the same
reasons they did in the § 3729(a)(1)(A)-(B) context: the
Complaint does not identify any specific report, much less any
specific false statement or inaccuracy it contains.  The
Complaint therefore does not plead facts sufficient to state a
claim under the first prong of § 3729(a)(1)(G).

### ii. Avoiding Obligation to Pay

The Complaint also fails to plead facts specifically
showing that the Retreat "knowingly and improperly avoid[ed] or
decrease[d] an obligation to pay or transmit money or property
to the Government" under the second prong of § 3729(a)(1)(G).
Again, while the Complaint describes several patient ledgers, in
none of these descriptions does the Complaint describe the
actual amount the Retreat should have been paid, or whether any
alleged overpayment was actually *retained* by the Retreat.

First, with respect to Patient 3, the Complaint describes a
series of accounting entries and concludes that the Retreat's
books reflect an overpayment credit due to the State Department
of Health "at least" $25,600.86 less than the true amount
overpaid.  ¶ 128.  While the description of accounting codes is
lengthy, the Complaint does not give any explanation for how it
reached the actual overpayment amount (and, indeed, by using the
language "at least," seems to concede that it does not have this
precise information).  Nor does the Complaint explain whether or

26

how anyone at the Retreat knew about the alleged overpayment, and thus fails to plead with specificity the requisite intent for fraud.

The same deficiencies exist with regard to the remaining patients.  In its discussion of Patient 8, the Complaint alleges that a Medicaid-funded program overpaid the Retreat by $49,321.89.  Again, the Complaint does not identify what rate was agreed upon by Medicaid and the Retreat, or how this represented an overpayment of that amount.  The allegations concerning Patient 9 are even more deficient, because not only do they not identify the contracted amount for services, they actually concede that there was not one.  Thus, the Complaint alleges that the Retreat was overpaid based on the fact that "it is doubtful that the [payer] meant to pay 74% of the Retreat's nominal charge" and thus the overpayment should be adjusted upward by "at least" $569.77.  ¶ 148.  This demonstrates that Relator not only fails to provide an explanation for the alleged overpayment, but he actually has no idea what the proper payment would have been.  These allegations are highly speculative and fail to meet the specificity requirement of Rule 9(b).

The allegations concerning the remaining patients fare no better.  As previously noted, Patient 15 does not actually allege retention at all, but mere delay.  Patient 16 involves a "commercial insurance payer," ¶ 79-80, and thus provides no

27

support for Relator's claims under the FCA.  Patients 17 through 29 include no information at all beyond the fact that their ledgers included Code 21 entries.  For Patient 30, the Complaint alleges that Nebraska Medicaid was charged more than the $476.10 per diem that it "contemplate[d] paying"; however, the Complaint does not explain how it reached this per diem amount.  In fact, the Complaint refers to an "attached contract for services and remittance advice," but no such contract is attached or even described.  Similarly, for Patients 31 and 32, the Complaint alleges overpayments without any allegation of what the proper reimbursement rate would have been.  The allegations regarding all of the patients not time-barred therefore fail to meet the specificity requirements under Rule 9(b).

Finally, even if the Complaint did plead facts to show that any of these Patient records demonstrated the improper retention of an overpayment, it still would fail the particularity requirements of Rule 9(b) because it does not plead facts sufficient to show the requisite level of scienter.  Under Rule 9(b), "plaintiffs [must] plead the factual basis which gives rise to a strong inference of fraudulent intent."  *Wood*, 328 Fed. Appx. at 747.  Here, the Complaint provides *no* facts to indicate that anyone at the Retreat knew about allegedly unlawfully retained government funds.  Relator alleges that he notified his superiors of the Code 21 practices, but the

Complaint makes it clear that these discussions always involved commercial insurance overpayments, which do not implicate the FCA.  Furthermore, the Complaint frequently states "upon information and belief" that overpayments were concealed at the direction of Retreat employees.  *See, e.g.*, ¶¶ 173, etc.  These allegations are too nonspecific to meet the heightened pleading requirements of fraud under Rule 9(b).  Thus, the Complaint pleads no facts to give rise to a strong inference of fraudulent intent.

Because the Complaint fails to plead any specific facts showing that the Retreat violated § 3729(a)(1)(G), Count III is also dismissed.

### CONCLUSION

For the reasons stated above, the Court finds that the Complaint has failed to meet the heightened pleading of requirements of Rule 9(b) and must be dismissed.  In his Opposition, Relator has asked the Court to dismiss without prejudice so that he may amend his Complaint to cure any pleading deficiencies.  Actions dismissed under Rule 9(b) are "almost always" dismissed with leave to amend.  *Luce*, 802 F.2d at 56.  The Court therefore grants leave to amend and the Complaint is **dismissed without prejudice**.  The Amended Complaint shall be filed within 30 days, and failure to comply with this deadline will result in dismissal with prejudice.

DATED at Burlington, in the District of Vermont, this 8th day of August, 2014.

/s/ William K. Sessions III
William K. Sessions III
United States District Judge